STATE OF NORTH CAROLINA v. RANDY LYNN ATKINS

No. 9A94

(Filed 9 October 1998)

1. **Criminal Law § 1359 (NCI4th Rev.)— first-degree murder—plea agreement—dismissal of sexual offense charge—aggravating circumstance not precluded**

   The trial court's acceptance of a plea agreement in which defendant agreed to plead guilty to first-degree murder of his eight-month-old son and the State agreed to dismiss a pending sexual offense charge and not to submit any evidence pertaining to a sexual offense did not improperly permit the State to preclude the submission of a statutory aggravating circumstance supported by the evidence where there was no evidence indicating any sexual offense during the four-week period of physical abuse and battery that caused the child's death.

2. **Criminal Law § 1340 (NCI4th Rev.)— capital sentencing—medical experts—injury comparisons—heinous, atrocious, or cruel aggravating circumstance**

   Testimony by four medical experts in a capital sentencing proceeding as to the severity of the child victim's injuries in comparison to injuries suffered by other children whom the experts had treated in their respective medical practices was properly admitted to establish the "especially heinous, atrocious, or cruel" aggravating circumstance by showing that the brutality of the child's death exceeded that normally present in a homicide. The trial court simply allowed comparative expert testimony, within the framework of the experts' experiences, which provided a measure or benchmark for the jury's consideration.

3. **Evidence and Witnesses § 694 (NCI4th); Criminal Law § 1340 (NCI4th Rev.)— capital sentencing—remorse by defendant—questions excluded—no offer of proof of testimony—absence of prejudice**

   Defendant failed to preserve for appellate review the issue of whether the trial court erred by excluding in a capital sentencing proceeding testimony by a DSS worker which defendant contended would have shown remorse and a suicide threat by defendant where defendant did not make an offer of proof developing the witness's responses to the excluded questions.

Assuming that the issue was properly preserved, the exclusion of this testimony did not amount to prejudicial error where the excluded testimony was hearsay; the trial court did not restrict defendant from inquiring as to the witness's personal observations concerning defendant's demeanor and emotional state at the time she interviewed him; to the extent that the desired result from this testimony was evidence of defendant's history or an incident of attempting suicide, such evidence was introduced through the testimony of an expert witness; and defendant was free to seek testimony from correctional officers to verify a potential or actual suicide threat rather than trying to introduce this impression by the witness's hearsay testimony. N.C.G.S. § 8C-1, Rule 103(a)(2).

**4. Constitutional Law § 346 (NCI4th); Evidence and Witnesses § 2956 (NCI4th)— capital sentencing—whether witness could receive death penalty—legal conclusion—proper exclusion**

The trial court did not deny defendant the right to confront a witness against him in a capital sentencing proceeding by refusing to permit a witness who had been charged with aiding and abetting first-degree murder in this case to answer a question as to whether she could receive the death penalty since defendant was allowed to inquire into any potential bias of the witness based upon any arrangement between the witness and the prosecution, and it was proper for the trial court to sustain an objection to a question that required the witness to reach a legal conclusion.

**5. Criminal Law § 1348 (NCI4th Rev.); Jury § 116 (NCI4th)— capital sentencing—voir dire—comments about parole—court's failure to instruct—plain error rule inapplicable**

The plain error rule did not apply to the trial court's failure to instruct the jury in a capital sentencing proceeding that "life means life" when a prospective alternate juror expressed concern about his ability to make a sentencing decision unless he could be assured that a life sentence included a stipulation that there could be no parole, the juror was excused for cause, and defendant did not request that the trial court give such an instruction and thus waived this issue under Rule 10(b)(2). The plain error doctrine will not be extended to situations in which the trial court has failed to give an instruction during jury *voir dire* which has not been requested.

STATE v. ATKINS

[349 N.C. 62 (1998)]

**6. Criminal Law § 432 (NCI4th Rev.)— capital sentencing—prosecutor's argument—lack of remorse—not comment on post-arrest silence**

In a capital sentencing proceeding for the first-degree murder of defendant's eight-month-old son, the prosecutor did not impermissibly comment on defendant's post-arrest silence in violation of defendant's constitutional right to remain silent by statements that drew attention to a police officer's testimony that defendant did not express remorse when informed that his son had died but stated, "You don't know how bad it is in the jail"; rather, the statements were directed to the State's contention that the jury should assign no mitigating value to the submitted mitigating circumstance that "defendant is remorseful."

**7. Evidence and Witnesses §§ 2954, 2970 (NCI4th)— capital sentencing—bias of witness—compensation—other death penalty cases**

The prosecution was properly permitted to cross-examine defendant's psychiatric expert in a capital sentencing proceeding concerning fees charged by the expert and his role in two other death penalty proceedings for the purpose of showing bias where there were significant discrepancies between the diagnosis made by defendant's expert and that made by the State's expert.

**8. Criminal Law § 447 (NCI4th Rev.)— capital sentencing—prosecutor's argument—bias of expert—compensation and participation in death penalty cases**

There was no gross impropriety in the prosecutor's argument in a capital sentencing proceeding concerning the potential bias of defendant's psychiatric expert based upon his compensation and his participation in two other death penalty proceedings when viewed in context of the conflicting evidence about defendant's psychological condition at the time of his assaults on the child victim.

**9. Criminal Law § 462 (NCI4th Rev.)— capital sentencing—prosecutor's argument—expert's participation in appeals—bias—no impropriety**

The prosecutor's argument in a capital sentencing proceeding about defendant's psychiatric expert's participation in other death penalty appeals was intended solely to suggest that the expert's involvement in numerous criminal cases indicated a bias in favor of defendant and did not impermissibly suggest that

**STATE v. ATKINS**

[349 N.C. 62 (1998)]

jurors should abdicate their responsibility and rely on appellate review to determine an appropriate sentencing recommendation.

**10. Criminal Law § 458 (NCI4th Rev.)— capital sentencing— prosecutor's argument—heinous, atrocious, or cruel aggravating circumstance—lingering death**

The prosecutor's closing argument in a capital sentencing proceeding did not mislead the jury into concluding that a decision of the N.C. Supreme Court required a finding of the (e)(9) especially heinous, atrocious, or cruel aggravating circumstance in all cases in which the victim did not die instantly; rather, the prosecutor's reference to the decision merely illustrated that a lingering death may be a factor supporting a finding of the (e)(9) aggravating circumstance. N.C.G.S. § 15A-2000(e)(9).

**11. Criminal Law § 447 (NCI4th Rev.)— capital sentencing— prosecutor's argument—diagnosis of defendant's expert**

The prosecutor's closing argument in a capital sentencing proceeding suggested to the jury only that the diagnosis of defendant's expert psychiatrist should not be believed and did not improperly contend that all psychiatrists routinely characterize depravity as a type of mental illness.

**12. Criminal Law § 458 (NCI4th Rev.)— capital sentencing— mitigating circumstance—prosecutor's argument—misstatement of law—intervention not required**

The trial court did not err by failing to intervene *ex mero motu* when the prosecutor misstated the law by arguing that a mitigating circumstance "has to have something to do with the death of that child." Moreover, the trial court adequately corrected any possible harm from the prosecutor's misstatement by properly instructing the jury during its charge on what constitutes mitigating circumstances and the weight to be given to them.

**13. Criminal Law § 1390 (NCI4th Rev.)— capital sentencing— age mitigating circumstance—submission not required**

The trial court was not required to submit the age statutory mitigating circumstance to the jury in this capital sentencing proceeding where defendant was twenty-nine years old at the time he killed his eight-month-old son, and defendant presented evidence that he suffered from conditions or disorders commonly found in adolescents and participated in an activity (playing

Nintendo) often enjoyed by youngsters, but the uncontroverted evidence also showed that defendant was functioning in the average to high-average range of intelligence with an IQ of 107, had a relatively good understanding of social nuances, graduated from high school and joined the Air Force, and worked at a cleaners operating complicated machinery.

**14. Criminal Law § 1382 (NCI4th Rev.)— capital sentencing— mitigating circumstances—no significant criminal history—submission not required**

The trial court did not err by failing to submit to the jury in a capital sentencing proceeding for the murder of defendant's eight-month-old son the (f)(1) mitigating circumstance of no significant history of prior criminal activity where the evidence showed that defendant was involved in an illegal sexual relationship with his son's mother and another male; defendant had a history of violent attacks, including fights in the military and repeated assaults on his son's mother even while she was pregnant; and defendant repeatedly and viciously beat his own infant son, which ultimately resulted in the son's death. N.C.G.S. § 15A-200(f)(1).

**15. Criminal Law § 690 (NCI4th Rev.)— capital sentencing— mitigating circumstances—peremptory instructions—no plain error**

The trial court's peremptory instruction on nonstatutory mitigating circumstances that "this factor has been established by the evidence. It is for you . . . to determine whether or not it has mitigating value" was not plain error since the instruction accurately conveyed the applicable law to the jurors.

**16. Criminal Law § 690 (NCI4th Rev.)— capital sentencing— mitigating circumstances—peremptory instructions— instruction on impartiality of court**

The trial court's concluding instruction in a capital sentencing proceeding on the impartiality of the court did not negate the potential value of the court's peremptory instructions on nonstatutory mitigating circumstances.

**17. Criminal Law § 358 (NCI4th Rev.)— capital sentencing— leg restraints on defendant—no abuse of discretion**

The trial court did not abuse its discretion in ordering defendant to wear leg restraints during a capital sentencing pro-

ceeding where the court conducted a hearing pursuant to N.C.G.S. § 15A-1031 following a report of a possible escape attempt by defendant from his jail cell; the trial court found evidence of numerous factors supporting the physical restraint of defendant; and the court limited any potential prejudice to defendant by having a cloth draped over the counsel table to conceal the leg restraints from the jury's view and by having defendant enter and leave the courtroom while the jury was not in the courtroom.

**18. Criminal Law § 115 (NCI4th Rev.)— discovery—written report and notes of defendant's expert**

The trial court did not err by issuing a discovery order requiring defendant's psychiatric expert to disclose a written report and by ordering the expert, during defendant's competency hearing, to supply to the prosecution "all of his notes," including those from conversations and interviews with defendant, where the expert relied on the discovery materials in testifying at defendant's competency hearing and at defendant's capital sentencing proceeding. N.C.G.S. § 15A-905(b).

**19. Criminal Law § 1338 (NCI4th Rev.)— capital sentencing— murder of child—prior abuse of child and child's mother— admissibility**

In a capital sentencing proceeding for the murder of defendant's eight-month-old son, the trial court properly admitted testimony by the child's mother about earlier abuse of the child and herself by defendant, and testimony by another witness indicating abuse by defendant of the child dating back to the time the child was three weeks old, since the testimony about abuse of the mother tended to explain why the child's mother did not seek earlier medical treatment for the child during the four-week period leading up to the child's death, and testimony about abuse of the child supported the submitted aggravating circumstance that the murder was "especially heinous, atrocious, or cruel."

**20. Criminal Law § 1340 (NCI4th Rev.)— capital sentencing— defendant's reading horror books and playing Nintendo— relevancy**

The trial court did not err by permitting the State to present evidence concerning defendant's reading of horror books and his playing of Nintendo in a capital sentencing proceeding for the murder of his eight-month-old son where the prosecutor con-

tended that defendant's alleged mental or emotional disorder was simply a recitation of stories gleaned from horror books, and the evidence about Nintendo was presented to show defendant's lack of remorse following his various assaults on his son.

**21. Criminal Law § 152 (NCI4th Rev.)— guilty plea—first-degree murder—premeditation and deliberation—factual basis—voluntariness**

A sufficient factual basis for the trial court's acceptance of defendant's plea of guilty of a premeditated and deliberate murder of his eight-month-old son was presented by the State's summary of the evidence and medical evidence tending to show that multiple, brutal injuries had been inflicted by defendant upon his son over a sustained period of time. Furthermore, the record shows that defendant's guilty plea was knowingly and voluntarily entered.

**22. Evidence and Witnesses § 2266 (NCI4th)— capital sentencing—battered child syndrome—evidence admissible—cause of death**

In a capital sentencing proceeding for the murder of defendant's eight-month-old son, testimony by a neurologist and a pediatric radiologist that the child suffered from battered child syndrome was admissible to show premeditation and deliberation and to support the (e)(9) aggravating circumstance that the murder was "especially heinous, atrocious, or cruel." Although battered child syndrome is merely a diagnostic profile and cannot be a technical cause of death, testimony that battered child syndrome was the cause of the child's death did not justify a new sentencing proceeding where it is apparent that neither the witnesses nor the prosecutor in closing argument claimed that the syndrome itself was the cause of death; rather, they asserted that the cumulative effect of injuries suffered by the child as a result of battering by defendant, which also qualified him for the diagnosis of battered child syndrome, was the cause of death.

**23. Constitutional Law § 345 (NCI4th)— capital sentencing—off-the-record bench conferences—defendant's right to presence not violated**

Defendant's constitutional right to be present at all stages of his capital trial was not violated by three off-the-record bench conferences involving only counsel during his capital sentencing proceeding where the conferences were conducted in the court-

room with defendant present and able to observe the context of the discussions and free to inquire of his attorneys as to the nature of the discussions, and the conferences were all reconstructed for the record following each conference. Assuming *arguendo* that the trial court erred by conducting the conferences off the record, the reconstruction shows beyond a reasonable doubt that any error was harmless. N.C. Const. art. I, § 23.

**24. Jury § 30 (NCI4th)— challenge to panel—statutory procedures not followed—question not before appellate court**

An assignment of error that the trial court failed to properly determine the statutory qualifications of jurors was not before the appellate court where defendant failed to follow the procedures set out in N.C.G.S. § 15A-1211(c) for jury panel challenge and further failed to alert the trial court to the alleged improprieties. N.C.G.S. § 15A-1446.

**25. Jury § 226 (NCI4th)— capital sentencing—jury selection— death penalty views—challenge for cause—rehabilitation not allowed**

The trial court did not abuse its discretion by denying defendant's request to attempt to rehabilitate prospective jurors in this capital sentencing proceeding when they were challenged for cause for their death penalty views where the record shows that all of the jurors ultimately responded to questions by the prosecutor and the trial court in a manner which unequivocally indicated that they would be unable to follow the law and recommend a death sentence if appropriate.

**26. Jury § 187 (NCI4th)— excusal for cause—waiver of appellate review**

Defendant's claim that the trial court erred by failing to excuse a prospective juror for cause in a capital sentencing proceeding on the ground that she had formed fixed opinions prior to the hearing was not preserved for appellate review where defendant never challenged the prospective juror for cause but exercised a peremptory challenge excusing her. N.C.G.S. § 15A-1214(h).

**27. Jury § 111 (NCI4th)— capital sentencing—pretrial publicity—individual voir dire denied**

The trial court did not abuse its discretion by denying defendant's motion for individual *voir dire* during jury selection in a

STATE v. ATKINS

[349 N.C. 62 (1998)]

capital sentencing proceeding on the ground that pretrial public-
ity exposed jurors to misleading and prejudicial statements
where no juror was selected who indicated that he or she would
have difficulty setting aside any pretrial impressions if selected
for service; challenges for cause were appropriately granted
when any prospective juror stated that he or she could not set
aside any preconceived notions; and although the trial court
informed defense counsel that reassertion of the motion was not
precluded as the *voir dire* was carried out, the motion for indi-
vidual *voir dire* was not renewed as jury selection proceeded.
N.C.G.S. § 15A-1214(j).

**28. Criminal Law §§ 20, 1335 (NCI4th Rev.)— capital sentenc-
ing—expert witness—testimony at competency hearing—
cross-examination**

The trial court did not err by permitting the prosecutor to
cross-examine a defense expert witness in a capital sentencing
proceeding concerning testimony presented at a previous com-
petency hearing since (1) N.C.G.S. § 15A-959(c), by its plain lan-
guage, prohibits the subsequent use of testimony introduced at
hearings for pleas of insanity and does not apply to competency
hearings, and (2) defendant himself, through his expert witness,
first introduced evidence referring to the testimony of a Dorothea
Dix psychiatrist initially presented at the competency hearing.

**29. Constitutional Law §§ 266, 352 (NCI4th); Criminal Law
§ 1335 (NCI4th Rev.)— capital sentencing—substantive
use of competency evaluation—no constitutional violation**

Defendant's constitutional rights against self-incrimination
and to counsel were not violated when the State made substan-
tive use of defendant's Dorothea Dix competency evaluation at
his capital sentencing proceeding where the competency evalua-
tion was performed at defendant's request; defendant presented a
defense strategy at the sentencing hearing alleging a learning dis-
order, an adjustment disorder, and disturbances of emotion and
conduct; defendant first introduced expert testimony concerning
his mental status; and defendant's expert witness admitted that
he relied upon the Dorothea Dix report as a basis for his expert
opinions at the sentencing hearing. The use of state-conducted
psychiatric evaluations to rebut defendant's psychiatric testi-
mony when defendant asserts a mental status defense does not
violate either the Fifth or the Six Amendment to the United States
Constitution.

**30. Criminal Law § 112 (NCI4th Rev.)— capital case—post-conviction discovery—State's attorney work product—exclusion by trial court**

The trial court did not violate N.C.G.S. § 15A-1415(f) by excluding portions of the State's attorney work-product materials from defendant's post-conviction discovery in a capital case since the expedited post-conviction discovery provided by § 1415(f) applies only to cases following completion of direct appeal, and defendant had not completed appellate review when the trial court made its discovery order. Assuming *arguendo* that § 1415(f) did apply to defendant's discovery request, the trial court complied with the statute by reviewing certain work-product materials *in camera* and by ultimately withholding the materials from discovery where the State challenged the release of what it deemed to be sensitive documents, and the trial court, after reviewing the documents *in camera*, concluded that the documents would not assist defendant.

**31. Constitutional Law § 344.1 (NCI4th)— hearing impairment—no denial of presence at capital trial**

Defendant's right to be present at all stages of his capital trial was not violated by the trial court's denial of defendant's motion for appropriate relief made on the ground that the trial court failed to accommodate a hearing impairment which rendered defendant unable to hear and fully participate in his competency and capital sentencing proceedings where all parties agreed that defendant suffered some degree of hearing impairment, but defendant's trial counsel testified that defendant consistently responded or reacted in his hearings in a way which indicated that he could hear what was going on; defendant's co-counsel testified that defendant never indicated throughout his competency and sentencing hearings that he could not hear the witnesses, the attorneys, or the instructions of the court; and defendant indicated during his plea colloquy with the trial court that he was able to hear and understand the court.

**32. Constitutional Law § 313 (NCI4th)— failure to investigate hearing impairment—not ineffective assistance of counsel**

Defendant was not denied the effective assistance of counsel by the alleged failure of his attorney to investigate his hearing impairment and to take measures to protect his rights where nothing in the record suggests that defendant's trial counsel failed to deliver an appropriate level of representation, and defendant presented no evidence that he informed trial counsel

that he was unable to hear and understand any part of the evidence or proceedings against him.

**33. Handicapped, Disabled, or Aged Persons § 15 (NCI4th)— capital sentencing—hearing impairment—no violation of Americans with Disabilities Act**

The trial court did not violate the Americans with Disabilities Act during defendant's capital sentencing proceeding by failing to accommodate defendant's hearing impairment where defendant failed to produce evidence that he was unable to hear or participate in the sentencing proceeding because of his purported hearing impairment, and the evidence supported findings by the trial court to the effect that defendant's hearing condition did not prevent him from reasonably hearing and understanding what occurred in the sentencing proceeding. Assuming *arguendo* that the Americans with Disabilities Act applied to defendant's situation, the evidence did not indicate that defendant was denied participation in the sentencing proceeding because of his hearing impairment.

**34. Criminal Law § 1402 (NCI4th Rev.)— murder of infant son—death penalty not disproportionate**

A sentence of death imposed upon defendant for the first-degree murder of his eight-month-old son was not excessive or disproportionate where defendant entered a plea of guilty to first-degree murder pursuant to a plea agreement; the infant victim endured a protracted series of severe beatings inflicted by defendant which resulted in multiple fractures; the jury found the existence of the especially heinous, atrocious, or cruel aggravating circumstance; defendant, a twenty-nine-year-old adult, was alone responsible for the child's death; the victim was killed in his home; and defendant attempted to conceal his assaults upon his child, forbidding the child's mother from seeking medical care for him during the four-week ordeal leading up to his death.

Justice WYNN did not participate in the consideration or decision of this case.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Saunders, J., at the 29 November 1993 Criminal Session of Superior Court, Buncombe County. Additionally, defendant appeals from an order denying his motion for appropriate relief entered by Ferrell, J., on 16 May 1997. Heard in the Supreme Court 27 May 1998.

*Michael F. Easley, Attorney General, by G. Patrick Murphy, Special Deputy Attorney General, for the State.*

*Center for Death Penalty Litigation, by Kenneth J. Rose, for defendant-appellant.*

LAKE, Justice.

Defendant was indicted on 12 April 1993 for first-degree sexual offense and for the first-degree murder of his eight-month-old son, Lyle James Atkins. On 18 November 1993, defendant entered into a plea agreement in which he agreed to plead guilty to the first-degree murder charge and the State agreed to dismiss the pending sexual offense charge and not to submit any evidence pertaining to this or any other sexual assaults purportedly committed by defendant. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant be sentenced to death for the murder of his infant son. Judge Saunders sentenced defendant accordingly.

The State presented evidence at the sentencing proceeding tending to show that, on 16 March 1993, defendant inflicted fatal injuries to his son, Lyle. Defendant, Lyle, and Lyle's mother were living together at the time at the Lazywood Mobile Home Park in Buncombe County.

Lyle's mother, Ms. Colleen Shank, testified that on the morning of 16 March 1993, she asked defendant to watch Lyle while she washed some clothes. Ms. Shank stated that she heard a "bang." Following the "bang," Ms. Shank heard Lyle begin to cry, and she rushed to the living room. Ms. Shank testified that she then observed defendant hitting Lyle's head against the trailer wall a "few times." She testified further that she saw defendant "swing him [Lyle] very strong" and that "Lyle hit the wall very hard." Ms. Shank tried to comfort Lyle and attempted to lay the child down to rest. However, Lyle soon began to cry, and Ms. Shank noted that he was turning blue. The mother administered CPR and requested that defendant go to a neighbor's home to call 911 for emergency assistance.

Defendant then went to the home of a neighbor and called 911. The 911 operator testified that defendant responded to her questions concerning medical history related to Lyle's emergency by replying "it [Lyle] may have been sick two or three days, but no other." Lyle's mother testified that while waiting for emergency personnel to

arrive, defendant told her, "Don't say anything, because I will hurt you too."

Following the arrival of emergency medical personnel, Lyle was transported by helicopter to Mission Memorial Hospital in Asheville. Upon admission to the hospital, Lyle was noted to be limp, not moving, and exhibiting a slow heart rate. The admitting physician noted numerous injuries to the small child, including bruising on both sides of his head, an older bruise on his left elbow, bruising on his right wrist and right hand, a deformation of his pelvis, and an improperly healed fracture of his right lower leg.

A detective from the Woodfin Police Department questioned defendant and Ms. Shank in the waiting room of the hospital. Defendant initially told the officer that Lyle had stopped breathing "because of the Ker-O-Sun heater." Defendant responded to the officer's further inquiry by adding that "a couple of days ago I was holding him, and he slipped and fell, and he hurt his arm." The officer subsequently arrested both defendant and Ms. Shank and transported them to the Buncombe County jail. Later that day, while in police custody, defendant issued a written statement in which he admitted the following:

> Today Lyle was crying as I was holding him, and my temper and patience snapped again, as he was crying and crying no matter how soothing and gentle I was. He just kept crying, and I couldn't handle him any more, and I started hitting him on the side of his head and trying to get him to stop crying, and he wouldn't. I kept telling him to stop it, and he wouldn't, and I kept on hitting him with my hand on his head.

Despite aggressive medical efforts to save Lyle's life, he died at Asheville's Mission Memorial Hospital on 18 March 1993. Following Lyle's death, defendant was indicted for the first-degree murder of his infant son. Defendant entered into a plea agreement dated 18 November 1993, consenting to a guilty plea to first-degree murder. As a condition to the plea, the State agreed to dismiss the first-degree sexual assault charge pending against defendant.

A capital sentencing proceeding was held in Superior Court, Buncombe County, beginning on 29 November 1993. The State presented evidence in support of one statutory aggravating circumstance: that the murder was "especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9) (1988) (amended 1994). An experienced

pediatric radiologist testified at the sentencing proceeding concerning the extent of injuries suffered by Lyle. The testimony indicated that the eight-month-old infant exhibited the following injuries upon admission to Mission Memorial Hospital on 16 March 1993: healing fracture of the right clavicle, healing bone along the midshaft of the right upper arm, extensive injury of the left upper arm, dislocation of the left elbow, healing bone indicative of a fracture of the right hip, skull fractures and bruising on both the left and right sides, and a compression fracture of the spine. Further testimony indicated that the injuries occurred in at least two episodes of injury to Lyle. The pediatric radiologist estimated that the time of the origin of injuries ranged from four weeks prior to the hospital admission up to within a day of the admission. Several treating physicians also testified at the sentencing proceeding that Lyle exhibited symptoms of "battered child syndrome." The State presented expert testimony by Dr. Cynthia Brown, a pediatrician, who defined a "battered child" as a "child that presents with multiple purposely inflicted injuries that are of varying ages."

Defendant presented evidence of twenty-five potential mitigating circumstances in addition to the statutory "catchall" mitigating circumstance during the capital sentencing proceeding. The jury rejected all but two of these potential mitigating circumstances, finding only (1) "the [d]efendant qualifies as having a learning disability due to his IQ variations," and (2) "the [d]efendant was diagnosed by Dr. Clabe Lynn in April of 1993 as having a personality disorder and adjustment disorder with a mixed disturbance of emotions and conduct." On 8 December 1993, the jury unanimously recommended that defendant be sentenced to death.

On 21 June 1995, defendant filed a motion for appropriate relief, and this Court remanded the motion in order that an evidentiary hearing could be held. At the 11 December 1996 session of Superior Court, Buncombe County, Judge Ronald K. Payne denied defendant's motion for discovery of all documents in the State's possession concerning the case, including attorney work-product material. This Court denied review of this order on 15 January 1997. An evidentiary hearing was conducted at the 10 March 1997 session of Superior Court, Buncombe County, Judge Forrest A. Ferrell presiding. By order dated 16 May 1997, defendant's motion for appropriate relief was denied. Defendant appeals the denial of this motion to this Court, along with his sentence of death for the first-degree murder. We consider both in this review.

**[1]** In his first assignment of error, defendant contends the trial court erred by permitting the State to enter into a plea agreement requiring the court to withhold evidence in support of an aggravating circumstance. Defendant argues that evidence of the first-degree sexual offense was relevant to two statutory aggravating circumstances: (1) "[t]he capital felony was committed while the defendant was engaged . . . in the commission of . . . a sex offense"; and (2) "[t]he capital felony was especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(5), (9). Defendant asserts that the plea agreement creates reversible error, as it introduces an impermissible, arbitrary factor into capital sentencing proceedings, in violation of the Eighth Amendment to the United States Constitution and Article I, Section 27 of the North Carolina Constitution. We hold that the plea agreement did not preclude the introduction of aggravating circumstances supported by the evidence, and therefore the trial court did not err by accepting the agreement.

Defendant is correct to note that this Court has held a district attorney may not exercise his discretion as to when an aggravating circumstance supported by the evidence will or will not be submitted to the jury. *See State v. Case*, 330 N.C. 161, 163, 410 S.E.2d 57, 58 (1991). The mandatory submission of all statutory aggravating circumstances is necessary to ensure the integrity of the capital sentencing procedure and "to prevent capital sentencing from being irregular, inconsistent and arbitrary." *Id.*

However, the principle enunciated by this Court in *Case* is clearly contingent upon the presence of genuine evidence supporting the statutory aggravating circumstances. *Id.* In the case *sub judice*, the plea agreement did not require the trial court to withhold submission of a statutory aggravating circumstance supported by credible evidence. The uncontroverted medical evidence indicated that Lyle endured an extended series of beatings, resulting in broken bones and bruises. Expert testimony further indicated that these injuries occurred during a four-week period prior to Lyle's death on 18 March 1993. The only evidence indicating a potential sexual assault was the presence of a relaxed rectal sphincter. The evidence relating to this potential sexual offense indicated that the relaxed sphincter was present in January 1993, two months prior to Lyle's murder. There was no apparent connection between this prior condition and the circumstances leading to or causing Lyle's death. The total absence of evidence indicating any sexual offense during the four-week period of physical abuse and battery that caused Lyle's death leads to the

inevitable conclusion that the trial court did not err by accepting the plea agreement which excluded evidence detrimental to defendant. We hold that defendant's initial assignment of error is without merit.

[2] In his second assignment of error, defendant asserts the trial court erred by permitting evidence and argument as to whether various medical experts had seen injuries as severe as those exhibited by Lyle. Over defense objections, four medical experts individually testified as to the severity of the victim's injuries in comparison to other injuries occurring to other children which the experts had treated in their respective medical practices. Dr. Jon Silver, a neurosurgeon, testified that Lyle's injuries were worse than the injuries sustained by a child he had previously treated who had been run over by a tractor. Dr. Robert Wiggins, a pediatric ophthalmologist, indicated that he had seen only one other patient with retinal hemorrhages as severe as Lyle's. Dr. David Merten, a pediatric radiologist, testified that, "In the twenty-two years that I have been doing pediatric radiology and in the nine years that I practiced pediatrics before becoming a pediatric radiologist, I have never seen as extensive bone injuries as this baby had." Dr. Cynthia Brown, the pediatrician initially responsible for Lyle's care upon his hospital admission on 16 March 1993, testified that Lyle was "probably the most severely battered child I've ever seen."

Defendant contends that the admission of such comparative expert testimony was irrelevant and prejudicial. Defendant asserts that allowing the introduction of such expert testimony potentially opens a Pandora's box, ultimately leading to battles among experts over the limits of their subjective experiences supporting or denying a description of a particular event as "especially heinous, atrocious, or cruel." Defendant suggests the trial court should have limited the evidence and testimony to the issue of whether the injuries to Lyle were caused by a brutality greater than that normally found in other first-degree murder cases, not whether the injuries were worse than other injuries encountered in particular medical experts' prior experiences. We conclude the admission of such comparative expert testimony was not error, as defendant has misstated the purpose and relevance of the testimony.

Admissibility of evidence at a capital sentencing proceeding is not subject to a strict application of the rules of evidence, but depends on the reliability and relevance of the proffered evidence. *State v. Rose*, 339 N.C. 172, 451 S.E.2d 211 (1994), *cert. denied,* 515

STATE v. ATKINS

[349 N.C. 62 (1998)]

U.S. 1135, 132 L. Ed. 2d 818 (1995). However, even strict application of the evidentiary rules supports the admission of the testimony offered by Drs. Silver, Wiggins, Merten and Brown. The expert medical testimony in question fully comports with the standards set forth in Rule 702, which provides, "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education[] may testify thereto in the form of an opinion." N.C.G.S. § 8C-1, Rule 702(1) (1992). Drs. Silver, Wiggins, Merten and Brown all qualified as expert witnesses based upon the standard set forth in Rule 702. The State submitted only one aggravating circumstance supporting a sentence of death, that the crime was "especially heinous, atrocious, or cruel." The State bore the ultimate burden of establishing the presence of the (e)(9) aggravating circumstance by showing that the brutality of Lyle's death exceeded that normally present in a homicide. *See State v. Goodman*, 298 N.C. 1, 257 S.E.2d 569 (1979). The trial court appropriately allowed the State to present testimony and evidence attempting to quantify and qualify the extent of injuries sustained and thus the amount or degree of suffering endured by Lyle. Comparisons of the extent of Lyle's injuries in relation to other injuries previously treated by the respective physicians clearly was evidence of a matter "relevant to sentence," which the trial court correctly deemed to have "probative value" in assisting the jury in evaluating the sole aggravating circumstance. N.C.G.S. § 15A-2000(a)(3). The trial court did not permit the State to usurp the jury's function by eliciting expert testimony that Lyle's death met the standard set forth in N.C.G.S. § 15A-2000(e)(9) as "especially heinous, atrocious, or cruel." Rather, the trial court simply allowed comparative expert testimony, within the frame of the experts' experiences, which provided a measure or benchmark for the jury's consideration. We hold that the trial court did not commit error by permitting this testimony.

[3] In his third assignment of error, defendant asserts the trial court erred by excluding potential mitigating testimony by Department of Social Services worker Audrey Bryant. The testimony concerned an interview the social worker conducted with defendant while he was in police custody. Defendant contends the social worker should have been allowed to testify that defendant was distraught, was suffering from emotional distress and was suicidal. Defendant suggests that this excluded testimony was essential to contradict evidence presented by the State depicting defendant as remorseless.

**STATE v. ATKINS**

[349 N.C. 62 (1998)]

The trial court limited the testimony as follows:

Q. Was there any indication of a suicide attempt [by defendant] or threat concerning that time?

A. I was told that there was.

[PROSECUTOR]: Objection; move to strike.

[THE] COURT: Sustained; disregard, members of the jury.

Q. When you interviewed Mr. Atkins, was the door open or shut?

A. It was open.

Q. And why was that?

[PROSECUTOR]: Objection, calls for hearsay.

[THE] COURT: Sustained.

Q. Was there anyone else present within a few feet or so of you during your interview?

A. There was a deputy outside the door.

Q. And why was that?

[PROSECUTOR]: Objection; calls for hearsay.

[THE] COURT: Sustained.

Defendant did not make an offer of proof developing the witness's responses to the questioning. Accordingly, defendant has failed to preserve this issue for appellate review according to the standard set forth in N.C.G.S. § 8C-1, Rule 103(a)(2). We do not agree that the substance of the excluded testimony was necessarily "apparent from the context within which questions were asked" and that therefore no offer of proof was necessary to preserve this issue for appeal. Although the initial thrust of the questioning related to suicide, the substance of Ms. Bryant's full testimony in response is not readily apparent. Ms. Bryant may very well have responded to the inquiries by stating that she did not know why the cell door was open or why an officer was stationed outside the cell. It is speculative for this Court to attempt to presume her testimony.

Assuming *arguendo* that this issue had been properly preserved and that the testimony may have indicated a suicide threat and arguably remorse by defendant, the exclusion of this testimony did not amount to prejudicial error. Our review of the record and tran-

script indicates that the trial court did not restrict defendant's counsel from inquiring as to Ms. Bryant's personal observations concerning defendant's demeanor and emotional state at the time of her interview. Moreover, to the extent the desired result from this testimony was evidence of defendant's history or an incident of attempting suicide, such evidence was introduced through the testimony of Dr. Joseph Horacek. Defendant also was free to seek testimony from correctional officers to verify a potential or actual suicide threat, rather than trying to introduce this impression by Ms. Bryant's hearsay testimony. Defendant chose not to pursue these avenues, and we thus hold that the trial court properly exercised its discretion in excluding the testimony, which had no mitigating value.

[4] In his fourth assignment of error, defendant contends the trial court erred by denying him the right to confront a witness testifying against him. Specifically, defendant contends the trial court improperly limited his ability to impeach the testimony of the State's primary witness at the sentencing proceeding, Lyle's mother, Colleen Shank. The trial court refused to permit defendant's counsel to inquire of Ms. Shank as to whether she could receive the death penalty for her involvement in Lyle's death.

Defendant asserts that this Court's holding in *State v. Prevatte*, 346 N.C. 162, 484 S.E.2d 377 (1997), should mandate an order directing a new capital sentencing proceeding. In *Prevatte*, this Court ordered a new sentencing hearing following a review of a trial court decision denying the defendant the opportunity to ask a prosecution witness about promises or expectations of preferential treatment in the resolution of pending charges against the witness. We conclude that, in the matter *sub judice*, the trial court properly restricted the questioning of Colleen Shank and did not thereby deny defendant the opportunity to confront a witness against him.

The trial court allowed exactly the type of questioning mandated by *Prevatte*. A review of the record reveals the following testimony:

Q. What are you charged with in this case?

A. Aiding and abetting first-degree murder.

Q. So you can't get the death penalty, can you?

[PROSECUTOR]: Objection.

A. I don't know.

THE COURT: Sustained. It's a question of law.

Q. What kind of promises, Ms. Shank, has the State made you in exchange for your testimony?

A. None.

Defendant was clearly allowed to inquire into any potential bias of Ms. Shank based upon any arrangement between the witness and the prosecution. The trial court properly sustained an objection to a question that required Ms. Shank to reach a legal conclusion. The trial court specifically allowed inquiry into any potential arrangement, and Ms. Shank responded that no such arrangement existed. It is entirely proper for a trial court, in the exercise of its discretion, to sustain an objection calling for the legal knowledge of a lay witness. *State v. Mason,* 295 N.C. 584, 248 S.E.2d 241 (1978), *cert. denied,* 440 U.S. 984, 60 L. Ed. 2d 246 (1979); *accord State v. Greene,* 285 N.C. 482, 206 S.E.2d 229 (1974). We hold that the trial court committed no error by refusing to allow the questions posed to Ms. Shank concerning her potential punishment.

**[5]** In his fifth assignment of error, defendant contends the trial court committed plain error by failing to instruct the jury not to consider parole in its deliberations, thus violating this Court's holding in *State v. Conner,* 241 N.C. 468, 85 S.E.2d 584 (1955). During *voir dire,* a prospective alternate juror expressed concern about his ability to make a sentencing decision based only upon the facts and the law unless he could be assured that a life sentence included a stipulation that there could be no parole. Based upon this expression, the trial court properly excused the prospective juror for cause. Defendant contends this discussion, which took place in the presence of the other jurors, triggered a duty for the trial court to issue a "life means life" instruction.

Defendant did not request that the trial court give a "life means life" instruction following the prospective juror's comments. Defendant's failure to raise this issue constitutes waiver under Rule 10(b)(2). This Court has applied the plain error analysis only to instructions to the jury and evidentiary matters. We decline to extend application of the plain error doctrine to situations in which the trial court has failed to give an instruction during jury *voir dire* which has not been requested. Accordingly, we conclude that this assignment of error is without merit.

**[6]** In his sixth assignment of error, defendant contends the trial court erred by permitting the prosecutor to comment on defendant's

post-arrest silence, in violation of his constitutional right to remain silent. The State presented testimony from a Buncombe County police officer who indicated that defendant did not express remorse when informed that Lyle had died. According to the testimony, defendant responded to the news of Lyle's death by stating, "You don't know how they're treating me in here. You don't know how bad it is in the jail." The prosecutor commented on defendant's callous response to Lyle's death during his closing argument, noting, "He didn't say 'I'm sorry.' He didn't say, 'Bless that baby's heart.' He said, 'You don't know how tough it is where I'm staying.' That was his statement. Now, if he felt remorse, you don't think there's [sic] been some mention of that?"

This Court has consistently recognized that, as a general rule, "[p]rosecutors are granted wide latitude in the scope of their argument." *State v. Zuniga*, 320 N.C. 233, 253, 357 S.E.2d 898, 911, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987). Counsel may properly argue "the facts in evidence and all reasonable inferences to be drawn therefrom." *State v. Huffstetler*, 312 N.C. 92, 112, 322 S.E.2d 110, 123 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). A prosecutor may not, however, refer to a defendant's election to exercise his constitutional right not to testify. *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91 (1976); *State v. Reid*, 334 N.C. 551, 434 S.E.2d 193 (1993).

We do not find that the comments and testimony challenged by defendant impermissibly address defendant's choice to exercise his right to remain silent or not to testify. The comments were clearly directed toward providing an accurate portrayal of defendant's emotionless response to Lyle's death. This evidence was relevant and necessary to adequately support the State's contention that the jury should assign no mitigating value to the submitted circumstance that "[t]he defendant is remorseful." The testimony in question and the prosecutor's closing comments did not focus on defendant's decision to remain silent. The comments simply drew attention to the relevant evidence of defendant's conduct and voluntary statements following his receipt of the news of Lyle's death. Accordingly, we hold that the trial court properly permitted this argument, and this assignment of error is overruled.

In his seventh assignment of error, defendant asserts the trial court erred by allowing cross-examination of defendant's expert witness concerning fees charged by the expert, as well as the expert's

role in two other death-penalty appeals. Defendant further contends the trial court permitted the prosecutor to distort the expert's testimony by characterizing the witness as a "hired gun" attempting to overturn death-penalty sentences on appeal. Defendant also suggests that the mention of Dr. Horacek's potential role in an appeal in the prosecutor's closing argument mandates the award of a new sentencing proceeding under *State v. Jones*, 296 N.C. 495, 251 S.E.2d 425 (1979).

**[7]** With respect first to the expert witness, the State appropriately attempted to illustrate a potential source of witness bias, as revealed by the expert witness's own *curriculum vitae*. The subject of compensation of a defendant's expert witness is clearly an appropriate matter for cross-examination. North Carolina's Rules of Evidence permit cross-examination of a witness "on any matter relevant to any issue in the case, including credibility." N.C.G.S. § 8C-1, Rule 611(b) (1992). This Court has additionally stated that the scope of cross-examination is subject to the control of the trial court, and "questions must be asked in good faith." *State v. Williams*, 279 N.C. 663, 675, 185 S.E.2d 174, 181 (1971). Our review of the trial transcript reveals significant discrepancies between the diagnosis made by defendant's psychiatric expert and the diagnosis reached by the State's expert. In view of this, it was entirely proper to elicit testimony indicative of potential witness bias. This Court specifically approved of such inquiry in *State v. Wilson*, 335 N.C. 220, 436 S.E.2d 831 (1993).

**[8]** With respect to mention of the expert's compensation during the prosecutor's closing argument, we further conclude that the argument did not violate the scope of permissible prosecutorial conduct. As we held in *State v. Allen*, 322 N.C. 176, 367 S.E.2d 626 (1988):

"[C]ounsel must be allowed wide latitude in the argument of hotly contested cases. He may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together with the relevant law, so as to present his side of the case. *State v. Monk*, 286 N.C. 509, 212 S.E.2d 125 [1975]; *State v. Noell*, 284 N.C. 670, 202 S.E.2d 750 [(1974), *death sentence vacated*, 428 U.S. 902, 49 L. Ed. 2d 1205 (1976)]. Whether counsel abuses [t]his privilege is a matter ordinarily left to the sound discretion of the trial judge, and we will not review the exercise of this discretion unless there be such gross impropriety in the argument as would be likely to influence the verdict of the jury."

*Allen,* 322 N.C. at 195, 367 S.E.2d at 636 (quoting *State v. Covington,* 290 N.C. 313, 327-28, 226 S.E.2d 629, 640 (1976)).

When viewed in context of the conflicting evidence concerning defendant's psychological condition at the time he committed his assaults upon Lyle, we determine that it was not a "gross impropriety" to argue the witness's potential bias related to his compensation and his similar participation in other death-penalty proceedings.

[9] With regard to the mention of appellate review, defendant misstates the extent of our holding in *Jones.* We did not conclude that *every* mention of appellate review mandates a new sentencing proceeding. Rather, we adopted a "rule precluding any argument which suggests to the jurors that they can depend on judicial or executive review to correct an erroneous verdict and thereby lessen the jurors' responsibility." *Jones,* 296 N.C. at 502, 251 S.E.2d at 429. In the case *sub judice,* the prosecutor's argument was intended solely to suggest that Dr. Horacek's involvement in numerous criminal cases indicated bias in favor of defendant. The argument in no way suggested that jurors could or should abdicate their responsibility and rely on appellate review to determine an appropriate sentencing recommendation, as prohibited by this Court in *Jones.* Accordingly, we hold that defendant's seventh assignment of error is without merit.

In his eighth assignment of error, defendant argues that the trial court erred by failing to intervene *ex mero motu* to restrict the prosecutor's closing argument in several respects. Defendant suggests the prosecutor's closing arguments, when viewed as a whole, violated N.C.G.S. § 15A-1230, as well as defendant's rights to due process, fundamental fairness and a nonarbitrary capital sentencing proceeding. It is important to note at the outset that defendant's counsel did not object to any portion of the closing argument at the sentencing proceeding. When a party fails to object to a closing argument, the appellate court must decide whether the argument was so improper as to require the trial court's intervention *ex mero motu. State v. Craig,* 308 N.C. 446, 457, 302 S.E.2d 740, 747, *cert. denied,* 464 U.S. 908, 78 L. Ed. 2d 247 (1983). This Court has further stated that the trial court is not required to intervene *ex mero motu* unless the argument strays so far from the bounds of propriety as to impede defendant's right to a fair trial. *State v. Small,* 328 N.C. 175, 400 S.E.2d 413 (1991). A review of the record reveals the prosecutor's comments during closing arguments were appropriate when viewed in light of the brutality of the crime and the fact that the State was seeking the imposition of the death penalty.

**[10]** First, defendant suggests the trial court allowed the prosecutor to misstate North Carolina case law to his prejudice. Specifically, defendant argues the prosecutor's closing argument misled the jury into concluding that our holding in *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987), required a finding of the "especially heinous, atrocious, or cruel" aggravating circumstance in all cases in which the victim did not die instantly. Our review of the record reveals that, when viewed in context, the prosecutor's closing arguments created no such impression. The prosecutor appropriately pointed out the four-week ordeal of pain and suffering endured by Lyle prior to his death. Lyle's torment was adequately supported by competent evidence and testimony. The prosecutor's reference to *Stokes* illustrated that a lingering death may be a factor supporting a finding of the (e)(9) statutory aggravating circumstance, that the crime was indeed "especially heinous, atrocious, or cruel."

**[11]** Continuing his eighth assignment of error, defendant also contends the trial court erred by permitting the prosecutor to characterize mitigating circumstances as, in effect, aggravating circumstances. In this regard, defendant suggests the prosecutor equated an alleged mental illness with a depraved mind, attempting to discredit the credibility of the entire psychiatric profession. We do not read the prosecutor's comments in that manner. Rather, we discern that the prosecutor suggested to the jury only that the diagnosis of defendant's expert psychiatrist should not be believed. The prosecutor, in his argument, contended only that this particular defendant was not mentally ill; the prosecutor did not contend that all psychiatrists routinely characterize depravity as a type of mental illness.

Defendant further contends the trial court erred by allowing the prosecutor to argue law and facts not supported by the evidence. As previously discussed, this Court has held that trial counsel are allowed wide latitude in their arguments to the jury and may argue any fact in evidence and all reasonable inferences drawn from them. *Craig*, 308 N.C. at 454, 302 S.E.2d at 745. Our careful review of the record as to each specifically challenged assertion does not lead us to conclude that the trial court permitted the argument of any fact which was not either supported by testimony or reasonable inference from testimony or based upon established knowledge. In reviewing the prosecutor's closing argument, we must consider the context in which the remarks were made and the overall factual circumstances to which they refer. *State v. Daniels*, 337 N.C. 243, 446 S.E.2d 298 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995). The pros-

ecutor has a duty to strenuously present the State's case and to " 'use every legitimate means to bring about a just conviction.' " *State v. Myers*, 299 N.C. 671, 680, 263 S.E.2d 768, 774 (1980) (quoting *State v. Monk*, 286 N.C. at 515, 212 S.E.2d at 130). We also dismiss defendant's suggestion that the prosecutor attempted to introduce an additional nonstatutory mitigating circumstance, the age of the victim. These assertions by defendant are without merit.

[12] Continuing his eighth assignment of error, defendant further argues the trial court erred by allowing the State in closing argument to distort the meaning and application of mitigating circumstances. Specifically, defendant argues the trial court failed to respond to the prosecutor's misstatement of the law concerning mitigating circumstances by not giving instructions designed to clarify and correct the misstatement. Defendant challenges the prosecutor's following statement to the jury: "They've told you the aggravating has to do with the death. Well, so do mitigating. It has to have something to do with what happened to that child."

Defendant is correct in that this comment in the prosecutor's argument was not a proper description of North Carolina law. A mitigating circumstance does not have to relate to what happened to the victim but rather may relate to "any aspect of defendant's character, record or circumstance of the particular offense." *State v. Irwin*, 304 N.C. 93, 104, 282 S.E.2d 439, 447 (1981) (citing *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978)). However, as to this comment, we conclude that the trial court did not err by failing to intervene *ex mero motu*, in the absence of defense counsel's objection. Moreover, the record reveals the trial court adequately corrected any possible harm from the prosecutor's statement by properly instructing the jury during its charge on what constitutes mitigating circumstances and the weight to be given to them.

Defendant makes several other contentions of improper statements by the prosecutor during closing argument. However, our careful review finds each statement to be well within the wide discretion accorded by this Court during closing argument, within the context of hotly contested cases, and thus we conclude each contention is without merit. This assignment of error is overruled.

[13] In his ninth assignment of error, defendant asserts the trial court erred by failing to submit the statutory mitigating circumstance of defendant's age at the time of the crime. *See* N.C.G.S. § 15A-2000(f)(7). Notwithstanding the fact that defendant was

twenty-nine years old at the time of the offense, he argues that there was substantial evidence to support the mitigating circumstance and that the trial court was required to submit the issue to the jury. We conclude that the evidence did not support the circumstance and that the trial court did not err by failing to submit the (f)(7) mitigating circumstance.

In support of the (f)(7) mitigating circumstance, defendant elicited the testimony of Dr. Horacek, who stated that defendant suffered from a dissociative identity disorder, as well as an attention deficit disorder. Dr. Horacek further noted that defendant exhibited a "learning disability profile" and reportedly spent long periods of time playing Nintendo. Lyle's mother, Colleen Shank, confirmed defendant's interest in Nintendo.

When evaluating the (f)(7) mitigating circumstance, this Court has characterized "age" as a "flexible and relative concept." *State v. Johnson*, 317 N.C. 343, 393, 346 S.E.2d 596, 624 (1986). We have also noted that "the chronological age of a defendant is not the determinative factor under G.S. § 15A-2000(f)(7)." *State v. Oliver*, 309 N.C. 326, 372, 307 S.E.2d 304, 332 (1983). However, while defendant has presented evidence that he suffered from conditions or disorders commonly found in adolescents and participated in an activity or activities often enjoyed by some youngsters, our review of the record reveals no evidence that defendant exhibited decisional skills and understanding equivalent to an adolescent. To the contrary, uncontroverted evidence showed defendant had an IQ of 107, was functioning in the average to high-average range of intelligence, and had a relatively good understanding of social nuances. Additional evidence indicated that defendant graduated from high school and joined the Air Force, where a recruiter described him as a "positive force." More recently, defendant worked at a cleaners, operating complicated machinery, ultimately leaving that job to assume a better-paying position. Therefore, we hold the trial court had no duty to submit the age statutory mitigating circumstance based on the evidence presented at the sentencing proceeding.

[14] In his tenth assignment of error, defendant contends the trial court erred by failing to submit the (f)(1) mitigating circumstance, that "defendant has no significant history of prior criminal activity." N.C.G.S. § 15A-2000(f)(1). Prior to submitting this circumstance, a trial court must "determine whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity."

*State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988). If the trial court decides that a rational jury could so conclude from the evidence, the jury is entitled to determine whether the evidence reveals a significant history. *Id.* A significant history of prior criminal activity for purposes of N.C.G.S. § 15A-2000(f)(1) is one likely to influence the jury's sentence recommendation. *State v. Sexton*, 336 N.C. 321, 444 S.E.2d 879, *cert. denied*, 513 U.S. 1006, 130 L. Ed. 2d 429 (1994). Because defendant's history of prior criminal activity was so excessive, we conclude the trial court did not err in deciding that no rational juror could determine that the circumstance existed. Therefore, we hold that the trial court did not err in failing to submit the (f)(1) mitigating circumstance.

Substantial evidence of defendant's prior criminal activity included references to defendant's extensive and recent pattern of criminal behavior. Defendant was involved in an illegal sexual relationship with Lyle's mother and another male. Evidence indicated that defendant abused drugs from an early age. Further, defendant was involved in three alcohol-related fights, which resulted in his being discharged from the Air Force after only three months. Defendant assaulted Lyle's mother during her pregnancy and threatened further violence if she informed police of his assaults on Lyle. Finally, defendant repeatedly abused his infant son Lyle over the course of Lyle's brief life, ultimately killing him as a result. Given the extent of this criminal activity, the trial court properly could have determined that no reasonable juror could conclude that defendant's history of prior criminal activity was insignificant.

This case is substantially similar to *State v. Daughtry*, 340 N.C. 488, 459 S.E.2d 747 (1995), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996), where we upheld the trial court's nonsubmission of the (f)(1) mitigating circumstance. The defendant in *Daughtry* was sentenced to death for beating his girlfriend to death with a large stick or log. The evidence of defendant Daughtry's prior criminal history included numerous beatings of the victim, shooting an acquaintance in the leg, being convicted of driving under the influence, and pleading guilty to a prior assault in which defendant hit a man in the head with a large stick causing serious injuries. There, we stated that "[g]iven the extent of this history, particularly defendant's *prior use of a large stick as a dangerous weapon and his multiple beatings of the victim*, the trial court properly could have determined that no reasonable juror could have concluded that defendant's criminal history was insignificant." *Id.* at 522, 459 S.E.2d at 765 (emphasis

added). In the case *sub judice*, defendant's prior history of criminal activity, like that in *Daughtry*, is mainly related to assaultive behaviors which were primarily directed toward the ultimate victim of his violence and the ultimate cause of his being convicted of murder. Defendant here had a significant history of violent attacks, including fights in the military and repeated assaults on Colleen Shank even while she was pregnant. He also repeatedly and viciously beat his own son, a completely defenseless infant and the victim of murder in this case. Combined with the evidence of his other prior criminal activities, these assaultive criminal activities make defendant's case for submission of the (f)(1) mitigating circumstance at least as weak, if not weaker, than the argument which we rejected in *Daughtry*. Therefore, we hold the trial court did not err by declining to submit the (f)(1) circumstance, and defendant's assignment of error is overruled.

[15] Defendant's eleventh assignment of error asserts the trial court committed plain error by failing to properly instruct the jury concerning eighteen nonstatutory mitigating circumstances uncontroverted by the evidence. Assuming this Court finds the instructions to be without error, defendant contends that comments made by the trial court following the instructions served to invalidate them and caused the jury to improperly consider the mitigating circumstances at issue. We find these contentions to be without merit.

At the sentencing charge conference, defendant's counsel requested a peremptory instruction on the nonstatutory mitigating circumstances established by the evidence. The trial court agreed to issue the following instruction: "The Court instructs the jury that this factor has been established by the evidence. It is for you, the jury, however, to determine whether or not it has mitigating value." The trial court gave substantially this same instruction on all the nonstatutory mitigating circumstances requested by defendant. Defendant did not object to the jury instructions at the close of the charge.

Defendant's failure to object to the instructions requires us to consider this challenge under a plain-error analysis. *State v. Neal*, 346 N.C. 608, 487 S.E.2d 734 (1997), *cert. denied*, —— U.S. ——, 140 L. Ed. 2d 131 (1998). Defendant, in his brief to this Court, relies on our holding in *State v. Lynch*, 340 N.C. 435, 459 S.E.2d 679 (1995), *cert. denied*, 517 U.S. 1143, 134 L. Ed. 2d 558 (1996), for support of his argument that the instructions in the matter *sub*

*judice* were insufficient. In *Lynch, this* Court suggested the use of the following peremptory instructions for nonstatutory mitigating circumstances:

> All the evidence tends to show [named mitigating circumstance]. Accordingly, as to this mitigating circumstance, I charge that if you find the facts to be as all the evidence tends to show, you will answer, "Yes," as to the mitigating circumstance Number [#] on the issue and recommendation form if one or more of you deems it to have mitigating value.

*Id.* at 476, 459 S.E.2d at 700.

Defendant's case was tried two years prior to our decision in *Lynch.* However, even application of the *Lynch* standard does not lead us to the conclusion that the instructions here were inadequate. A trial court is not required to give a requested instruction verbatim. *State v. Corn,* 307 N.C. 79, 296 S.E.2d 261 (1982). The trial court's instructions conveyed the proper message to the jury—that the nonstatutory mitigating circumstances in question were established as existing circumstances by the evidence but that the jurors could " 'reject the nonstatutory mitigating circumstance if they [did] not deem it to have mitigating value.' " *State v. Green,* 336 N.C. 142, 174, 443 S.E.2d 14, 32-33 (quoting *State v. Gay,* 334 N.C. 467, 492, 434 S.E.2d 840, 854 (1993)), *cert. denied,* 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). We conclude the peremptory instructions challenged by defendant accurately conveyed the applicable law to the jurors.

**[16]** Furthermore, we determine that defendant's argument that the trial court's concluding instruction negated any potential value of the peremptory instructions lacks merit. Defendant objects to the following instruction:

> The law requires the presiding judge to be impartial. You're not to draw any inference from any ruling I may have made or inflection in my voice or expression on my face or anything else I may have said or done during the trial that would lead you to believe that I have an opinion or have intimated one as to whether any part of the evidence should be believed or not, as to whether any aggravating or mitigating circumstance has been proved or not, or as to what your recommendation ought to be. It is your exclusive province and duty to find the true facts of this case and make a recommendation reflecting the truth as you find it.

When viewed in proper context, the trial court's concluding instruction, which is verbatim from North Carolina's pattern jury instructions, did not negate the earlier peremptory instructions. The trial court was simply advising the jury, in the customary language, that the law requires the presiding judge to be completely impartial. Accordingly, we hold that the trial court did not err by stressing the impartiality of the court in its closing charge to the jury.

[17] In his twelfth assignment of error, defendant contends the trial court erred by permitting the placement of leg irons on defendant during the sentencing proceeding. Defendant argues that the trial court violated the statutory provisions of N.C.G.S. § 15A-1031, as well as defendant's right to due process. We hold that the trial court did not commit error in this regard.

N.C.G.S. § 15A-1031 provides the following:

A trial judge may order a defendant or witness subjected to physical restraint in the courtroom when the judge finds the restraint to be reasonably necessary to maintain order, prevent the defendant's escape, or provide for the safety of persons. If the judge orders a defendant or witness restrained he must:

(1) Enter in the record out of the presence of the jury and in the presence of the person to be restrained and his counsel, if any, the reasons for his action; and

(2) Give the restrained person an opportunity to object; and

(3) Unless the defendant or his attorney objects, instruct the jurors that the restraint is not to be considered in weighing evidence or determining the issue of guilt.

If the restrained person controverts the stated reasons for restraint, the judge must conduct a hearing and make findings of fact.

N.C.G.S. § 15A-1031 (1997).

Our review of the record reveals the trial court followed the procedure mandated by N.C.G.S. § 15A-1031. The trial court conducted a hearing pursuant to the statute, following a report of defendant's possible escape attempt from his jail cell. Additional evidence indicated, and the trial court noted, that defendant had a propensity towards

violence, as illustrated by his guilty plea to the brutal beating of his infant son and expert testimony at defendant's prior competency hearing reflecting a violent disposition.

The ultimate decision concerning the restraint of a defendant rests within the trial court's discretion. *State v. Tolley*, 290 N.C. 349, 226 S.E.2d 353 (1976). The trial court is in the best position to balance the conflicting interests between defendant's right to a proceeding free of prejudice and the State's need to maintain control over and prevent disruption of the court proceedings. The trial court's discretion is not unbridled and must be exercised in a manner that is "not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by reason and conscience of the judge to a just result." *Langnes v. Green*, 282 U.S. 531, 541, 75 L. Ed. 520, 526 (1931). The circumstances appropriate for the trial court's consideration include, *inter alia*: defendant's temperament and character, his age and physical attributes, his past record, his past escapes or attempted escapes, evidence of a present plan to escape, and threats to harm others or to cause a disturbance. *See State v. Tolley*, 290 N.C. at 368, 226 S.E.2d at 368.

The trial court in the instant case found evidence of numerous factors supporting the physical restraint of defendant. A hearing was conducted to allow argument by all parties concerning the need for restraint. All discussions concerning the need for physical restraint took place outside of the presence of the jury. The trial court ensured that a cloth was draped over defendant's counsel table to completely conceal the leg restraints from view by the jurors, thus limiting any potential prejudice to defendant. Defendant always entered the courtroom before the jurors and left the courtroom after the jurors so they would not view his leg irons. It is abundantly clear from the record that the trial court did not abuse its discretion in ordering defendant to wear restraints during the proceeding. Rather, it is apparent that the trial court took every conceivable precaution to evaluate the need for restraints and to minimize any potential prejudice to defendant. Accordingly, defendant's twelfth assignment of error is overruled.

[18] In his thirteenth assignment of error, defendant argues the trial court erred by requiring a defense expert to issue a written report and to produce materials beyond those required by the applicable statute. Defendant objects to the trial court's order which mandated the disclosure of the following:

[A]ll results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with this case, or copies thereof, within the possession or control of the defendant which the defendant intends to introduce in evidence at the trial or which were prepared by a witness or the agent or employee of a witness whom the defendant intends to call at the trial.

Furthermore, at the competency hearing, the trial court ordered defendant's expert witness, Dr. Horacek, to supply "all of his notes," including those from conversations and interviews with defendant. Defendant argues the trial court erred by requiring such extensive discovery, which was later used to cross-examine defendant's witness. Defendant suggests the discovery order violated not only N.C.G.S. § 15A-905(b), but also violated defendant's attorney's work-product privilege, his right against self-incrimination and his right to counsel. We hold that the discovery order did not result in reversible error.

N.C.G.S. § 15A-905 provides the procedures for court-ordered pretrial discovery in criminal cases. The statute addresses mental examinations and tests, in relevant part, as follows:

If the court grants any relief sought by the defendant under G.S. 15A-903(e), the court must, upon motion of the State, order the defendant to permit the State to inspect and copy or photograph results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with the case, or copies thereof, within the possession and control of the defendant which the defendant intends to introduce in evidence at the trial or which were prepared by a witness whom the defendant intends to call at the trial, when the results or reports relate to his testimony.

N.C.G.S. § 15A-905(b) (1997).

The issue before this Court regarding defendant's challenge to the discovery order is not whether defendant intended to introduce specific tests at trial, but whether the expert relied on or gleaned any information from the tests and answers which related to the expert's testimony. *See State v. McCarver*, 341 N.C. 364, 462 S.E.2d 25 (1995), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996). Our review of the record clearly reveals that Dr. Horacek relied on the challenged discovery material at the competency hearing, as well as at the sen-

tencing proceeding. Accordingly, we conclude the trial court did not err by issuing the discovery order, and we overrule this assignment of error.

[19] Defendant, in his fourteenth assignment of error, contends the trial court erred by allowing State witnesses to testify to specific prior acts of misconduct by defendant based on hearsay, without adequate notice and unrelated to any aggravating circumstance. Specifically, defendant objects to (1) the testimony of Lyle's mother, in which she related earlier abuse of Lyle and herself by defendant; and (2) the testimony of Wanda Frady, in which she indicated potential child abuse dating back to the time when Lyle was only three weeks old. We conclude that this assignment of error is without merit.

As an initial matter, we note that defendant did not object to the testimony during the sentencing proceeding. Accordingly, this has not been preserved for review. N.C.G.S. § 15A-1446 (1997); N.C. R. App. P. 10(b). However, assuming *arguendo* that defendant had preserved this claim for appellate review, this assignment of error nevertheless fails. Formal rules of evidence do not apply at a capital sentencing proceeding. N.C.G.S. § 8C-1, Rule 1101(b)(3) (1992). The trial court has latitude and discretion to allow any evidence it deems relevant to sentencing. *State v. Heatwole*, 344 N.C. 1, 473 S.E.2d 310 (1996), *cert. denied*, —— U.S. ——, 137 L. Ed. 2d 339 (1997). The evidence in question was clearly related to defendant's sentencing. Defendant's treatment of Lyle and Lyle's mother tended to explain why Lyle's mother did not seek earlier medical treatment during the four-week period leading up to Lyle's death. The testimony also revealed important information concerning the parental relationship between defendant and Lyle, supporting the jury's recognition of the sole submitted aggravating circumstance, that the crime was "especially heinous, atrocious, or cruel."

[20] In his fifteenth assignment of error, defendant contends the trial court committed reversible error by permitting the State to present evidence and argument concerning defendant's activities, which included reading horror books and playing Nintendo. Defendant contends that this issue is controlled by the United States Supreme Court's decision in *Dawson v. Delaware*, 503 U.S. 159, 117 L. Ed. 2d 309 (1992), where the Court held that evidence of gang membership had no relevance to the issues being decided in the proceeding and that admission of the evidence violated the First Amendment. The

Court noted that "the evidence proved nothing more than [defendant's] abstract beliefs." *Id.* at 167, 117 L. Ed. 2d at 318. For the following reasons, we reject this assignment of error.

Unlike the evidence in *Dawson,* the challenged evidence presented at defendant's sentencing proceeding was directly relevant to issues before the jury. Defendant offered numerous circumstances which he suggested mitigated his culpability for the murder. Among these mitigating circumstances were suggestions that defendant was under the influence of a mental or emotional disturbance and that defendant was remorseful. The State's evidence and arguments concerning defendant's interest in horror books were used to impeach defendant's contention that he suffered a mental or emotional disorder. The prosecutor argued the alleged mental illness was simply a recitation of stories gleaned from the horror books. The evidence concerning Nintendo use was presented to show defendant's lack of remorse following his various assaults on Lyle. *Dawson* did not prohibit all evidence related to activities protected by the First Amendment, but merely required the evidence to be relevant to an issue in the capital sentencing proceeding. Contrary to defendant's argument, we conclude the evidence was not employed for the purpose of inflaming the jury's moral sensibilities. We hold the trial court did not err when it permitted the testimony in question.

[21] In his sixteenth assignment of error, defendant argues the trial court erred by accepting defendant's guilty plea to first-degree murder. Defendant contends that the trial court lacked sufficient factual basis for the plea, and that the plea was accepted without a knowing and voluntary waiver of defendant's rights. As to the first part of this contention, defendant maintains the plea proceeding record is devoid of any evidence to support a plea of premeditated and deliberate murder. Defendant calls our attention to N.C.G.S. § 15A-1022, which provides in pertinent part:

(c) The judge may not accept a plea of guilty or no contest without first determining that there is a factual basis for the plea. This determination may be based upon information including but not limited to:

(1) A statement of the facts by the prosecutor.

(2) A written statement of the defendant.

(3) An examination of the presentence report.

(4) Sworn testimony, which may include reliable hearsay.

(5) A statement of facts by the defense counsel.

N.C.G.S. § 15A-1022(c) (1997).

The statute clearly does not require the trial court to find evidence from each, any or all of the enumerated sources. The trial court may consider any information properly brought to its attention, and the trial record must reflect the information and evidence relied upon in reaching the decision that an adequate factual basis does exist. *State v. Sinclair*, 301 N.C. 193, 270 S.E.2d 418 (1980); *State v. Dickens*, 299 N.C. 76, 261 S.E.2d 183 (1980). In the present case, the trial court relied on the State's summary of the evidence, as well as medical evidence detailing Lyle's injuries. Our review of the record leads us to conclude that the evidence provides a sufficient factual basis to support defendant's plea of guilty to premeditated murder.

In defendant's presence in open court, the State presented an evidentiary recitation showing the following: Lyle was not breathing when medical personnel first responded to his emergency; Lyle ultimately died of a fractured skull, which the doctors said took "tremendous force"; Ms. Shank witnessed defendant attacking Lyle; and Lyle had endured a series of bruises and broken bones occurring over a several-week period. Moreover, at a competency hearing conducted the day prior to the guilty plea, the same trial court heard Dr. Clabe Lynn testify that defendant made a statement admitting that he was "playing with [Lyle] and the next thing he knew he was hitting him on the top of the head." We hold that this recitation was sufficient to provide a factual basis for defendant's plea.

Further, it is well settled that premeditation and deliberation can be inferred from circumstances such as the brutality of the killing, the nature and number of the victim's injuries, and the dealing of lethal blows after the victim has already been incapacitated. *State v. Rasor*, 319 N.C. 577, 356 S.E.2d 328 (1987). The medical evidence presented by the State tended to show that multiple, brutal injuries had been inflicted upon Lyle by defendant over a sustained period of time. From this, one can readily infer that defendant totally abdicated his parental role, providing Lyle not with support and nurturing, but rather providing continued, deliberate pain and violence which culminated in the child's death. This evidence provided a sufficient basis from which premeditation and deliberation could be inferred. We

therefore perceive no error in the trial court's acceptance of defendant's plea of guilty to murder in the first degree.

Turning to the second part of defendant's assignment of error concerning the guilty plea, defendant argues the trial court erred by accepting the plea without a sufficient showing that the plea was knowingly and voluntarily entered. A plea of guilty involves the waiver of several fundamental rights, including freedom from self-incrimination and the right to a trial by jury. *See State v. Barts*, 321 N.C. 170, 174, 362 S.E.2d 235, 237 (1987). It is therefore imperative that guilty pleas represent a voluntary, informed choice. *Sinclair*, 301 N.C. at 197-98, 270 S.E.2d at 421.

Our review of the record of defendant's plea proceeding reveals the plea was knowingly and voluntarily given, as evidenced by the following exchange between the trial court and defendant:

Q. Mr. Atkins, I'm going to now ask you a series of questions from this Transcript of Plea. If you would please speak up so the Court Reporter over here can make a notation for the record, it would be appreciated. First of all, are you able to hear and understand me?

A. Yes, sir.

Q. Do you understand you have the right to remain silent and any statement you make may be used against you?

A. Yes, sir.

Q. Are you under the influence of any alcohol, drugs, narcotics, medicines, pills, or any other intoxicants?

A. No.

Q. Have you discussed your case fully with your attorneys, and are you satisfied with their services?

A. Yes, sir.

Q. Do you understand that you're pleading guilty to the felony of first-degree premeditated and deliberated murder?

A. Yes.

Q. And that there are two parts to a potential capital case, the guilt or innocence phase and the sentencing phase, do you understand that?

A. Yes, sir.

Q. Have the charges been explained to you by your lawyer, do you understand the nature of the charges, and do you understand each and every element of the charge?

A. Yes, sir.

Q. Do you understand that upon your plea, depending upon the sentencing phase, that the jury could recommend life or death as the verdict?

A. Yes, sir.

Q. Do you understand you have the right to plead not guilty, to have a jury trial, and at the trial to confront and cross examine the witnesses against you, and by this plea you're giving up all of your other Constitutional Rights, as well as your confrontation rights related to a trial by jury?

A. Yes, sir.

Q. Do you plead guilty, and are you in fact guilty?

A. Yeah.

. . . .

Q. Other than the plea arrangement, has anybody made any promises or threatened you at all to cause you to enter this plea against your will?

A. No.

Q. Are you entering this plea of your own free will, fully understanding what you are doing?

A. Yes, sir.

Q. Do you have any questions about what has been said to you or anything else connected with your case?

A. No.

Q. You are thirty years of age and completed the twelfth grade?

A. Yes, sir.

Following this discussion with defendant, the trial court heard the prosecutor present a summary of the facts and evidence against defendant. Following a brief recess, the trial court held that "there's

a factual basis for the plea, which is freely, voluntarily and understandingly entered; the defendant is satisfied with his attorney, is competent to stand trial, and the pleas are his informed choice and being freely, voluntarily and understandingly made, it is accepted and is ordered recorded." We agree with the trial court's decision that the plea was made knowingly and voluntarily, and accordingly we overrule this assignment of error.

[22] In his seventeenth assignment of error, defendant contends the trial court committed reversible error by permitting the prosecutor to introduce evidence and testimony indicating that Lyle suffered from "battered child syndrome" and that such syndrome was a cause of Lyle's death. Defendant argues that the introduction of such evidence was error as a matter of law and that the evidence was extremely confusing and its probative value substantially outweighed by prejudice to defendant. We disagree.

The evidence concerning "battered child syndrome" was extemely relevant to the jury in reaching an appropriate sentencing decision. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). Generally, all relevant evidence is admissible. N.C.G.S. § 8C-1, Rule 402 (1992). This Court has stated that "in a criminal case every circumstance calculated to throw any light upon the supposed crime is admissible and permissible." *State v. Collins*, 335 N.C. 729, 735, 440 S.E.2d 559, 562 (1994).

Relevant evidence may, however, be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (1992). "Whether to exclude relevant but prejudicial evidence under Rule 403 is a matter left to the sound discretion of the trial court." *State v. Handy*, 331 N.C. 515, 532, 419 S.E.2d 545, 554 (1992). We conclude the trial court did not abuse its discretion by permitting a neurologist and a pediatric radiologist to testify that battered child syndrome was the cause of Lyle's death.

This Court has previously approved the admission of expert testimony with respect to battered child syndrome. *State v. Wilkerson*, 295 N.C. 559, 247 S.E.2d 905 (1978). Evidence demonstrating battered child syndrome " 'simply indicates that a child found with [certain injuries] has not suffered those injuries by accidental means.' " *Id.* at

570, 247 S.E.2d at 911 (quoting *People v. Jackson*, 18 Cal. App. 3d 504, 507, 95 Cal. Rptr. 919, 921 (1971)).

This Court approved the use of battered child evidence in a capital proceeding in *State v. Elliott*, 344 N.C. 242, 475 S.E.2d 202 (1996), *cert. denied*, —— U.S. ——, 137 L. Ed. 2d 312 (1997). In the present case, the evidence of battered child syndrome was relevant both to the circumstances of the crime and to the sole submitted aggravating circumstance. Concerning the circumstances of the offense, the evidence was relevant to demonstrate premeditation and deliberation. The State presented evidence that Lyle suffered extensive injuries over a four-week period, leading to his ultimate death. This evidence supported the State's contention that defendant did not simply "snap" and "lose control" on 16 March 1993. Rather, the evidence indicated that defendant engaged in a deliberate, prolonged process of severely beating and torturing Lyle.

The battered child syndrome evidence was also relevant to support the (e)(9) aggravating circumstance that the crime was "especially heinous, atrocious, or cruel." The evidence revealed a horrifying picture of a crippled, helpless, eight-month-old infant who slowly died at the hands of his father, the defendant. This evidence was probative and necessary to demonstrate to the jury the presence of the (e)(9) circumstance, that this crime demonstrated a killing which was " 'conscienceless, pitiless, or unnecessarily torturous to the victim.' " *State v. Lynch*, 340 N.C. 435, 459 S.E.2d 679 (1995), *cert. denied*, 517 U.S. 1143, 134 L. Ed. 2d 558 (1996) (quoting *State v. Brown*, 315 N.C. 40, 65, 337 S.E.2d 808, 826-27 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986)). Given the high probative value of the testimony concerning battered child syndrome, we hold the trial court did not err by permitting the introduction of this evidence.

Furthermore, while defendant is technically correct in his assertion that battered child syndrome cannot be a cause of death, his argument is of no avail. According to the expert witnesses who testified at trial, battered child syndrome is nothing more than a profile of indicative symptoms, which, when noticed by a medical professional either in isolation or in combination, lead to the conclusion that a child is being battered or has been battered in the past. Such symptoms might include such things as distinctive burns, extensive bruising, head and abdominal injuries, bones broken in patterns which correlate with those of known cases of abuse, and retinal hemorrhaging (indicating violent shaking or beating of the child's head).

Since battered child syndrome is merely a diagnostic profile, it cannot therefore be a technical cause of death.

The distinction drawn here, however, is largely semantic and does not justify a new sentencing proceeding in the instant case. When examined closely, it is apparent that neither the witnesses in their testimonies nor the prosecutor in his closing argument were claiming that the "syndrome" itself was the cause of death. What they were asserting was that the cumulative effect of injuries suffered by Lyle as a result of his horrific battering, which also qualified him for the diagnosis of battered child syndrome, was the cause of death. Thus, we find no error in the trial court's admission of such evidence and argument. This assignment of error is overruled.

[23] In his eighteenth assignment of error, defendant contends the trial court denied defendant's constitutional right to be present at all stages of his capital trial. Defendant argues the trial court conducted three separate off-the-record bench conferences involving only counsel. Defendant contends this Court's holding in *State v. Meyer*, 345 N.C. 619, 481 S.E.2d 649 (1997), mandates the award of a new capital sentencing proceeding. Our review of the record and applicable precedent leads us to hold that the off-the-record bench conferences did not violate defendant's constitutional right to be present at all stages of his trial.

Defendant correctly states that, in a capital trial, a defendant must be present at every stage of the proceeding. N.C. Const. art. I, § 23. This constitutional mandate serves to safeguard both defendant's and society's interests in reliability in the imposition of capital punishment. *State v. Huff*, 325 N.C. 1, 30, 381 S.E.2d 635, 651 (1989), *sentence vacated on other grounds*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990). This constitutional protection imposes upon the trial court the affirmative duty to ensure defendant's presence at every stage of a capital trial. Additionally, defendant's right to be present at every stage of his capital trial is not waivable. *State v. Artis*, 325 N.C. 278, 297, 384 S.E.2d 470, 480 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990); *State v. Huff*, 325 N.C. at 31, 381 S.E.2d at 652.

However, defendant's reliance on *State v. Meyer* is misplaced. In *Meyer*, this Court disapproved of unrecorded, in-chambers discussions between the trial court and attorneys, noting that "the nature and content of the discussion cannot otherwise be gleaned

from the record." *Meyer*, 345 N.C. at 623, 481 S.E.2d at 652. The Court further determined that "the State has failed to meet its burden of showing the error was harmless beyond a reasonable doubt. Accordingly, we are required to order a new sentencing proceeding." *Id.*

In contrast, our review of the record in the case *sub judice* indicates the three off-the-record conferences were conducted not in chambers, but in the courtroom with defendant present and able to physically observe the context of the discussion and free to inquire of his attorneys as to the nature of the discussions. Additionally, the off-the-record bench conferences were all reconstructed for the record following each conference. The record reveals the three conferences concerned the following: a request by defense counsel to lodge a *Batson* challenge, a discussion of a scheduling problem with a State witness, and scheduling for the final week of defendant's sentencing proceeding. Assuming *arguendo* the trial court did err by conducting the conferences off the record, the reconstruction permits the State to clearly show beyond a reasonable doubt that any error was harmless. *See State v. Lee*, 335 N.C. 244, 439 S.E.2d 547, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994). Based upon the aforementioned reasons, we reject this assignment of error.

[24] In his nineteenth assignment of error, defendant contends the trial court erred by failing to properly determine questions of juror competency, purportedly violating defendant's rights pursuant to N.C.G.S. §§ 9-3 and 15A-1211. Defendant alleges the trial court failed to determine the statutory qualifications of the jurors and singled out a single juror for questioning about citizenship. Our review of the record leads us to conclude that the trial court complied with the statutory mandates in the selection of the jurors.

The trial court "must decide all challenges to the panel and all questions concerning the competency of jurors." N.C.G.S. § 15A-1211(b) (1997). In the case *sub judice*, the record reflects that defendant never challenged the jury panel selection process in any manner. The applicable statute specifically states that while a defendant may make a challenge to the jury panel, the challenge:

(1) May be made only on the ground that the jurors were not selected or drawn according to law.

(2) Must be in writing.

(3) Must specify the facts constituting the ground of challenge.

(4) Must be made and decided before any juror is examined.

N.C.G.S. § 15A-1211(c).

In light of the fact that defendant failed to follow the procedures clearly set out for jury panel challenges and further failed, in any manner, to alert the trial court to the alleged improprieties, we hold that this assignment of error is not properly before this Court for review. N.C.G.S. § 15A-1446; *see State v. Workman*, 344 N.C. 482, 476 S.E.2d 301 (1996).

[25] In his twentieth assignment of error, defendant argues that the trial court erred by refusing to allow defense counsel to attempt to rehabilitate jurors who expressed opposition to the death penalty. Defendant argues that this Court's decision in *State v. Brogden*, 334 N.C. 39, 430 S.E.2d 905 (1993), supports a right of rehabilitation of prospective jurors who express uncertainty about their ability to impose the death penalty according to the laws of North Carolina. We disagree with defendant's analysis of purported "uncertainty." In his brief, defendant draws this Court's attention to the following *voir dire* of prospective juror Barbara Robison by the trial court:

Q. Could you make a decision in this matter based only on the evidence and the law and not on anything else?

A. I'm not in favor of the death penalty.

Q. Are you indicating then that as a matter of conscience and regardless of what the facts and circumstances were that you could not render a verdict based upon the evidence and the law?

A. Probably not.

Q. If you were selected to serve as a juror and the State proved the three things it's required to prove, it would be your duty as a juror, if you were going to give the State a fair trial, to recommend the death penalty. Do you understand that?

A. Yes.

Q. Could you do that duty if you were convinced that they proved everything they were required to prove notwithstanding your reservations?

A. I don't know if I could do it.

Q. Is that a no or you're not sure?

A. I'm not sure, but I don't think I could do it.

Q. Then are your views concerning the death penalty such that you would be prevented or substantially impaired from performing your duties as a juror in accordance with the instructions and your oath?

A. If I made a decision like that, I think I would probably regret it.

Q. Okay. Are you indicating that your views concerning the death penalty then would impair you from making a decision recommending it even if the State proved each and every one of the things they were required to prove so that it would be your duty to make that recommendation?

A. Yes, sir.

THE COURT: Tender for cause?

[THE PROSECUTOR]: Yes, sir.

THE COURT: The court will excuse you, ma'am, for cause—you may step downstairs, ma'am—concluding that as a matter of conscience regardless of the facts and circumstances, she couldn't render a verdict with respect to the charge in accordance with the law and that her views concerning the death penalty would prevent or impair her from performing her duties in accordance with the instructions and her oath.

Our review of the record clearly reveals that, while prospective juror Robison initially struggled with her convictions, she ultimately responded in a manner which unequivocally indicated that she would be unable to follow the law and recommend a death sentence if appropriate. Therefore, it was entirely proper for the trial court to exercise its discretion in permitting the State's challenge for cause.

The record further indicates that all other prospective jurors excused for this cause likewise expressed opinions and answers supporting the trial court's decisions. The trial court is best situated to make such determinations, as it hears the jurors' answers and observes the jurors' demeanor. "The defendant is not allowed to rehabilitate a juror who has expressed unequivocal opposition to the death penalty in response to questions propounded by the prosecutor and the trial court. The reasoning behind this rule is clear. It prevents

harassment of the prospective jurors based on their personal views toward the death penalty." *State v. Cummings*, 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990). We will not disturb the trial court's ruling on a challenge for cause absent a showing of an abuse of that discretion. *See State v. Brogden*, 334 N.C. at 43, 430 S.E.2d at 908. We hold the trial court in the case *sub judice* did not abuse its discretion when denying defendant's request to attempt to rehabilitate various prospective jurors. This assignment of error is overruled.

[26] In his twenty-first assignment of error, defendant asserts the trial court erred by failing to excuse prospective juror Denise Sales for cause on the ground that she had formed fixed opinions prior to the sentencing proceeding. The record reveals Ms. Sales clearly indicated to the trial court that she had strong personal feelings about child abuse. However, Ms. Sales never unequivocally stated she would be unable to follow the law and fulfill her duties as a juror. She stated, "I can be fair, but a baby being involved I'd be more harsh about it. That's all I can tell you." Following this expression, defense counsel never challenged prospective juror Sales for cause. Counsel chose instead to make a peremptory challenge excusing her from jury selection. This claim has not been preserved for appellate review according to the requirements of N.C.G.S. § 15A-1214(h). *See State v. Hartman*, 344 N.C. 445, 476 S.E.2d 328 (1996), *cert. denied*, —— U.S. ——, 137 L. Ed. 2d 708 (1997). In the absence of a proper challenge for cause during the trial court proceeding, it is impossible for us to attempt to evaluate this assignment of error.

[27] In his twenty-second assignment of error, defendant assigns as error the trial court's denial of individual *voir dire* during jury selection. Defendant contends that excessive pretrial publicity caused prospective jurors to be exposed to misleading and prejudicial statements during the jury selection process. Defendant argues the trial court abused its discretion by denying defense counsel's motion for individual *voir dire*.

The North Carolina General Assembly has provided guidance concerning individual *voir dire* and the sequestering of jurors during the selection process. The applicable statute provides: "In capital cases the trial judge for good cause shown may direct that jurors be selected one at a time, in which case each juror must first be passed by the State. These jurors may be sequestered before and after selection." N.C.G.S. § 15A-1214(j) (1997). A trial court's ruling on whether to grant sequestration and individual *voir dire* of prospective jurors

will not be disturbed on appeal absent a showing of an abuse of discretion. *State v. Reese*, 319 N.C. 110, 353 S.E.2d 352 (1987), *overruled on other grounds by State v. Barnes*, 345 N.C. 184, 481 S.E.2d 44, *cert. denied,* —— U.S. ——, 139 L. Ed. 2d 134 (1997), *and cert. denied,* —— U.S. ——, 140 L. Ed. 2d 473 (1998). While it is true that many prospective jurors indicated that they had read about or heard about the present case prior to trial, our review of the record does not reveal the selection of any juror who indicated that he or she would have difficulty setting aside any pretrial impressions if selected for service. Conversely, the record reveals that challenges for cause were appropriately granted whenever any prospective juror stated that he or she could not set aside any preconceived notions. Moreover, the trial court advised the defense, when issuing the order denying defendant's motion for individual *voir dire*, "[The] motion is denied at this time. It does not preclude reassertion, depending upon the circumstances, as the *voir dire* is carried out." Defendant's counsel never renewed the motion for individual *voir dire* as jury selection proceeded. Defendant has failed to demonstrate any abuse of discretion in the trial court's order denying individual *voir dire*. This assignment of error is overruled.

[28] In his twenty-third assignment of error, defendant argues the trial court erred by permitting the prosecutor to cross-examine a defense expert witness concerning testimony presented at a previous competency hearing. Defendant attempts to support this position with reference to N.C.G.S. § 15A-959(c), which provides in pertinent part:

> (c) Upon motion of the defendant and with the consent of the State the court may conduct a hearing prior to the trial with regard to the defense of insanity at the time of the offense. If the court determines that the defendant has a valid defense of insanity with regard to any criminal charge, it may dismiss that charge, with prejudice, upon making a finding to that effect. The court's denial of relief under this subsection is without prejudice to the defendant's right to rely on the defense at trial. If the motion is denied, no reference to the hearing may be made at the trial, and recorded testimony or evidence taken at the hearing is not admissible as evidence at the trial.

N.C.G.S. § 15A-959(c) (1997).

We determine the trial court did not err by permitting the cross-examination. N.C.G.S. § 15A-959(c) prohibits subsequent use of testi-

mony introduced at hearings concerning pleas of insanity. The testimony used to cross-examine defendant's expert was presented at a competency hearing, not at an insanity hearing. Contrary to the suggestion in defendant's brief, N.C.G.S. § 15A-959(c), by its plain language, does not refer or apply to competency hearings.

Additionally, we note that our review of the record reveals that defendant himself, through his expert witness, first introduced evidence referring to the testimony of a Dorothea Dix psychiatrist initially presented at the previous competency hearing. The defense expert testified that he was provided with a copy of the Dorothea Dix evaluation and "relied on the report and things contained therein." During direct examination, the defense expert also took pains to explain why his evaluation differed from that provided by the Dorothea Dix psychiatrist. Defendant cannot now be heard to complain about evidence which he initiated and introduced into the proceeding. Accordingly, we find this assignment of error meritless.

[29] Defendant, in his twenty-fourth assignment of error, contends the trial court erred by permitting the State to make substantive use of defendant's Dorothea Dix competency evaluation at the sentencing proceeding. Defendant suggests the introduction and use of such evidence violated his Fifth and Sixth Amendment rights, relying on the United States Supreme Court's holding in *Estelle v. Smith*, 451 U.S. 454, 68 L. Ed. 2d 359 (1981). We disagree and hold that the trial court's admission of the report did not violate defendant's constitutional rights.

The United States Supreme Court, in *Estelle*, determined that under the facts present in that case, the petitioner's challenge to the introduction of a psychiatric evaluation must be upheld. However, the Court emphasized the limited scope of that holding, stating that the decision turned on the "distinct circumstances" of that case. *Id.* at 466, 68 L. Ed. 2d at 371. The distinguishing characteristics of the *Estelle* controversy included the following: the trial court had ordered, *ex mero motu*, the psychiatric examination; the petitioner had not asserted an insanity defense; and the petitioner never offered any psychiatric evidence at trial. In stark contrast, in the case *sub judice*, the competency hearing was performed at defendant's request; defendant presented a defense strategy alleging, *inter alia*, a learning disorder, an adjustment disorder, and disturbances of emotion and conduct; and defendant introduced expert testimony concerning his mental status. The instant case is clearly distinguishable from *Estelle*. As the Supreme Court noted in *Buchanan v. Kentucky*,

483 U.S. 402, 97 L. Ed. 2d 336 (1987), the use of state-conducted psychiatric evaluations for the limited purpose of rebuttal of a defendant's psychiatric testimony does not constitute a Fifth Amendment violation. *Id.* at 423, 97 L. Ed. 2d at 355. Additionally, the Court noted that no Sixth Amendment violation occurs when such evaluations are used at a trial in which a defendant asserts a defense including "mental status," as defense counsel are certainly on notice that following the use of such a "mental status" defense, the use of psychological evidence by the prosecutor is expected. *Id.* at 423, 97 L. Ed. 2d at 356. Defendant initially introduced expert testimony concerning his mental status. Defendant's expert witness admitted that he relied upon the very report to which defendant now objects as a basis for his expert opinions at the sentencing hearing. The State was clearly entitled to use this same evidence to rebut defendant's assertions. We hold that this assignment of error is without merit.

[30] Defendant also raises additional assignments of error associated with the trial court's rulings on his motion for appropriate relief, on remand from this Court. Defendant first contends the trial court erred and violated N.C.G.S. § 15A-1415(f) by excluding portions of the State's attorney work-product materials from his discovery request. Defendant suggests that N.C.G.S. § 15A-1415(f) fails to exclude work-product materials from post-conviction discovery in capital cases, and as such, the trial court committed error by reviewing certain work-product materials *in camera* and by ultimately withholding the material from discovery. We hold the trial court did not err in reviewing the requested material *in camera* for two reasons: (1) the expedited post-conviction discovery provided by N.C.G.S. § 15A-1415(f) applies only to cases following completion of direct appeal, and defendant had not reached such a stage when he made his motion; and (2) despite the fact that we are not required to review defendant's discovery request, the trial court nevertheless complied with the requirements of N.C.G.S. § 15A-1415(f) when evaluating defendant's request.

On 21 June 1996, the North Carolina General Assembly ratified "An Act to Expedite the Postconviction Process in North Carolina." Ch. 719, 1995 N.C. Sess. Laws 389, 397. Among other things, the Act amended N.C.G.S. § 15A-1415 to add this new subsection:

(f) In the case of a defendant who has been convicted of a capital offense and sentenced to death, the defendant's prior trial or appellate counsel shall make available to the capital defend-

ant's counsel their complete files relating to the case of the defendant. The State, to the extent allowed by law, shall make available to the capital defendant's counsel the complete files of all law enforcement and prosecutorial agencies involved in the investigation of the crimes committed or the prosecution of the defendant. If the State has a reasonable belief that allowing inspection of any portion of the files by counsel for the capital defendant would not be in the interest of justice, the State may submit for inspection by the court those portions of the files so identified. If upon examination of the files, the court finds that the files could not assist the capital defendant in investigating, preparing, or presenting a motion for appropriate relief, the court in its discretion may allow the State to withhold that portion of the files.

N.C.G.S. § 15A-1415(f) (1997).

As recently noted by this Court, N.C.G.S. § 15A-1415(f) applies only to the post-conviction process and only to defendants who have been convicted of a capital crime and sentenced to death. *State v. Bates*, 348 N.C. 29, 497 S.E.2d 276 (1998). Defendant's allegation of error does not come under the provisions of N.C.G.S. § 15A-1415(f), as defendant had not exhausted his direct appeal opportunities at the time of his discovery request. Accordingly, the trial court was not obligated to utilize the more liberal discovery provisions of N.C.G.S. § 15A-1415(f), and it did not abuse its discretion when reviewing the documents *in camera*.

Defendant correctly notes that the apparent legislative intent of N.C.G.S. § 15A-1415(f) is to "expedite the post-conviction process in capital cases while ensuring thorough and complete review." *Bates*, 348 N.C. at 37, 497 S.E.2d at 280-81. It is apparent the statute fits into a broader statutory scheme designed to provide full disclosure to counsel for capital defendants so that "they may raise all potential claims in a single motion for appropriate relief." *Id.* As again noted in defendant's brief, a "thorough review of the conviction avoids piecemeal and delayed presentation of claims." However, defendant is asking this Court to sanction exactly such piecemeal analysis.

Defendant had not completed appellate review when the trial court made its discovery order. Both cases relied on by defendant involved discovery motions made following completion of direct appellate review. *See State v. McHone*, 348 N.C. 254, 499 S.E.2d 761 (1998); *State v. Bates*, 348 N.C. 29, 497 S.E.2d 276. Accordingly, we

conclude the trial court was not bound by N.C.G.S. § 15A-1415(f) and therefore did not err when making the decision to review the requested materials *in camera.*

Moreover, assuming *arguendo* that N.C.G.S. § 15A-1415(f) did apply to defendant's discovery request, the trial court fully complied with and satisfied the statutory mandate by conducting an *in camera* review of the work-product materials. This Court has held that N.C.G.S. § 15A-1415(f) "does not provide an express or implied protection for work product of the prosecutor or law enforcement agencies." *Bates*, 348 N.C. at 37, 497 S.E.2d at 281. However, N.C.G.S. § 15A-1415(f) does not mandate disclosure of all materials relating to a capital conviction which may be in the possession of the State pursuant to a motion for appropriate relief. The statute specifically, by clear and unequivocal language, allows the State, upon "reasonable belief that allowing inspection of any portion of the files by counsel for the capital defendant would not be in the interest of justice," to initially submit the documents not to a defendant, but to the trial court for inspection of such portion. The statute authorizes a trial court to deny access to such portions of the files, providing that when the "court finds that the files could not assist the capital defendant in investigating, preparing, or presenting a motion for appropriate relief, the court in its discretion may allow the State to withhold that portion of the files." N.C.G.S. § 15A-1415(f).

In the matter *sub judice*, the State challenged the release of what it deemed to be sensitive documents. The trial court appropriately reviewed the documents *in camera*, ultimately concluding that the documents would not assist defendant. Accordingly, we conclude the trial court acted pursuant to this statute and did not abuse its discretion in reviewing and denying access to the work-product documents.

In his final assignment of error, defendant alleges that the trial court's dismissal of his motion for appropriate relief resulted in denial of his statutory and constitutional rights during the capital trial. Specifically, defendant contends the following: (1) that because of his hearing impairment and poor conditions inside the Buncombe County courthouse, he was unable to hear and fully participate in all of the proceedings against him; (2) that due to physical restraints, defendant was unable to see significant portions of the evidence against him when witnesses utilized exhibits outside the witness stand; (3) that the trial court failed to accommodate his hearing impairment, denying defendant his constitutional right to be present

at all stages of his capital trial; (4) that defendant's trial counsel's failure to investigate his hearing loss and take appropriate measures to protect his rights denied defendant his constitutional right to effective assistance of counsel; and (5) that defendant's capital sentencing proceeding violated the Americans with Disabilities Act of 1990, as well as North Carolina law. Our review of the record leads us to conclude the trial court did not err by denying defendant's motion for appropriate relief, as defendant failed to meet his burden of "proving by a preponderance of the evidence every fact essential to support the motion." N.C.G.S. § 15A-1420(c)(5) (1997).

[31] This Court has held that the decisions of a trial court concerning a motion for appropriate relief are binding on defendant if they were supported by evidence, "even though the evidence is conflicting, . . . and notwithstanding defendant's testimony at the hearing to the contrary." *State v. Stevens*, 305 N.C. 712, 720, 291 S.E.2d 585, 591 (1982). The evidence and testimony presented at the hearing on defendant's motion for appropriate relief amply support the trial court's decision denying the motion. All parties present at the motion hearing agreed that the acoustics inside the Buncombe County courthouse were less than ideal. However, the acoustics and audiometer measurements of the courthouse were not the real issue concerning the court at the motion hearing. The real issue concerned defendant's actual ability to hear, understand and participate in the capital proceedings.

Both the State and defendant proffered evidence evaluating defendant's hearing abilities. Again, all parties agree that defendant suffered some degree of hearing impairment. There was, however, a marked difference of opinion between the parties concerning defendant's ability to hear and understand the proceedings. William Auman, defendant's trial counsel, testified at the hearing that defendant consistently "respond[ed] or react[ed] in a way throughout the trial that led you to believe that he could hear what was going on during his trial." Mr. Auman's co-counsel, Curtiss Graham, likewise testified that throughout the competency hearing and sentencing proceeding defendant never indicated that he could "not hear the witnesses against him or the instructions of the Court or anything that any of the lawyers were saying." Defendant himself indicated during his plea colloquy with the trial court that he was able to hear and understand the court. This evidence, combined with other testimony at the hearing on the motion for appropriate relief, amply supports the trial court's decision denying defendant's motion in this regard.

**[32]** We also conclude the trial court did not err when dismissing defendant's ineffective assistance of counsel claim. The United States Supreme Court has held that in order to prevail on an ineffective assistance of counsel claim, a defendant must satisfy a two-pronged test. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674 (1984). Our statutorily enacted test for prejudice mirrors the *Strickland* test. N.C.G.S. § 15A-1443(a) (1988); *State v. Braswell*, 312 N.C. 553, 324 S.E.2d 241 (1985). To satisfy this test, a defendant must initially show that counsel's performance was so deficient that counsel was not "functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693. A defendant must then show that counsel's deficient performance deprived him of a fair trial. *Id.* Application of this standard to the case before this Court establishes that defendant was not denied effective assistance of counsel. Nothing in our review of the record and transcript suggests that defendant's trial counsel failed to deliver an appropriate level of "counsel" or representation. Importantly, defendant presented no evidence at the hearing which indicated that he informed trial counsel that he was unable to hear and understand any part of the evidence or proceedings against him. This contention is meritless.

**[33]** Finally, defendant argues the trial court's failure to adequately address his hearing impairment violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101-213 (1997). Defendant's claim is based primarily on section 12132 of the Act, which provides that "no qualified individual with a disability shall, by reason of such disability, . . . be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." A regulation promulgated under the Act elaborates this particular provision by requiring public entities to "furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity." 28 C.F.R. § 35.160(b)(1) (1998). Since defendant failed to produce any evidence that he was unable to hear or participate in the instant proceedings because of his alleged hearing impairment, we hold the trial court did not violate the provisions of the Americans with Disability Act during defendant's sentencing proceeding.

As previously discussed, the trial court was presented with conflicting evidence as to the extent of defendant's hearing impairment.

From this evidence, the trial court made numerous findings of fact, including the following:

29. At times during the trial, counsel for the defendant met with the defendant on evenings and weekends. Discussions regarding what had occurred in court were had. The defendant never indicated to his counsel that he wasn't hearing or understanding what was going on in the trial.

. . . .

39. In open court during the arraignment and the court's inquiry from the Transcript of Plea, the defendant was able to hear and understand and respond to the questions put to him by the presiding judge.

. . . .

65. The defendant's hearing condition was not such that he could not reasonably hear and understand the proceedings.

Our review of the record clearly indicates that the above findings of fact are amply supported by competent evidence. Assuming *arguendo* the Americans with Disabilities Act applies to defendant's situation, it is apparent the trial court complied with the provisions of the Act by providing defendant an opportunity to participate in the proceedings. The evidence does not indicate that defendant was denied participation based upon his hearing impairment. This assignment of error is without merit.

## PRESERVATION ISSUES

Defendant raises ten issues which he concedes have been decided against his position by this Court: (1) the trial court erred by excusing prospective jurors for cause based on their feelings about capital punishment; (2) the trial court erred by limiting the questioning of jurors opposed to a life sentence, violating defendant's rights pursuant to Article I, Section 19 of the North Carolina Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution; (3) the trial court erred by issuing North Carolina pattern jury instructions imposing a "duty" upon the jury to return a recommendation of death if it finds the mitigating circumstances were insufficient to outweigh the aggravating circumstances and the aggravating circumstances were sufficiently substantial to call for the death penalty; (4) the trial court erred by instructing the jury in a manner requiring the jurors to consider only the mitigating

circumstances they individually found and not to consider mitigating circumstances found by other jurors; (5) the trial court erred by failing to instruct the jury that the State had the burden of proving the nonexistence of each mitigating circumstance beyond a reasonable doubt and by placing the burden on defendant to prove each mitigating circumstance by a preponderance of the evidence; (6) the trial court's use of the term "may" in sentencing Issues Three and Four made consideration of proven mitigating circumstances discretionary with the sentencing jurors; (7) the trial court erred by instructing the jury that mitigating circumstances must outweigh aggravating circumstances; (8) the trial court erred by submitting to the jury the "especially heinous, atrocious, or cruel" aggravating circumstance within the context of instructions that "failed adequately to limit the application of this inherently vague and overly broad circumstance"; (9) the trial court erred by instructing the jurors that they could reject nonstatutory mitigating evidence on the basis that it had no mitigating value; and (10) the death penalty is discriminatory and arbitrary on its face and as applied to this case. We have fully considered defendant's arguments relating to these assignments of error and find no compelling reason to depart from our prior holdings on these issues. Therefore, we overrule each of these assignments of error.

## PROPORTIONALITY REVIEW

Having concluded that defendant's plea and capital sentencing proceeding were free of prejudicial error, we are required by statute to review the record and determine (1) whether the evidence supports the aggravating circumstance found by the jury; (2) whether passion, prejudice or "any other arbitrary factor" influenced the imposition of the death sentence in this case; and (3) whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). After thoroughly reviewing the record, transcript and briefs in the present case, we conclude that the record fully supports the aggravating circumstance found by the jury. Further, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

One purpose of proportionality review "is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Another

is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). We defined the pool of cases for proportionality review in *State v. Williams*, 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), and *State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995), and we compare the instant case to others in the pool that "are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. at 198, 443 S.E.2d at 47.

**[34]** In the case *sub judice*, defendant entered into a plea agreement, pleading guilty to the first-degree murder of his infant son, Lyle Atkins. At sentencing, the trial court submitted the sole aggravating circumstance that the murder was "especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9). The jury unanimously found the existence of this aggravating circumstance. The jury at sentencing did not find either of the two statutory mitigating circumstances submitted for its consideration: (1) that the capital felony was committed while defendant was under the influence of a mental or emotional disturbance, or (2) that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. *See* N.C.G.S. § 15A-2000(f)(2), (6). The jury also did not find the existence of any other statutory or nonstatutory mitigating circumstance not specifically submitted pursuant to the "catchall" provision mandated by N.C.G.S. § 15A-2000(f)(9). The jury did, however, find the existence of two of the twenty-three nonstatutory mitigating circumstances submitted for its consideration: (1) that defendant qualifies as having a learning disability due to his IQ variations, and (2) that defendant was diagnosed by Dr. Clabe Lynn in April of 1993 as having a personality disorder and adjustment disorder with mixed disturbance of emotions and conduct.

This case has several distinguishing characteristics: the victim was a helpless, defenseless infant; the victim's brutal murder was found to be especially heinous, atrocious, or cruel in that the victim suffered great physical pain before his death; and finally, the victim endured a protracted series of severe beatings inflicted by his father,

resulting in multiple fractures. These characteristics collectively distinguish this case from those in which we have held the death penalty disproportionate.

In our proportionality review, it is appropriate to compare the present case to those cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). Of the cases in which this Court has found the death penalty disproportionate, only two involved the "especially heinous, atrocious, or cruel" aggravating circumstance. *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653; *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983). Neither *Stokes* nor *Bondurant* is similar to this case.

In *Stokes*, the defendant and a group of coconspirators robbed the victim's place of business. This Court vacated the sentence of death because defendant Stokes was only a teenager, and it did not appear that he was more deserving of death than an older accomplice, who received only a life sentence. In the present case, defendant alone, a twenty-nine-year-old adult, was responsible for Lyle's death. In *Stokes*, the defendant was convicted under a theory of felony murder, and there was virtually no evidence of premeditation and deliberation. In the present case, the series of senseless beatings amply supports an inference of premeditation and deliberation. Finally, in *Stokes*, the victim was killed during a robbery, at his place of business. In this case, the victim was killed in his home, at the hands of his father. A murder in one's home "shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure." *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). The violation of the right to security in one's own home is even more shocking when the victim is a small infant, totally dependent upon others for care.

In *Bondurant*, the victim was shot while riding with the defendant in a car. *Bondurant* is distinguishable because the defendant immediately exhibited remorse and concern for the victim's life by directing the driver to go to the hospital. The defendant also went into the hospital to secure medical help for the victim. In the present case, by contrast, defendant attempted to conceal his assaults upon Lyle, forbidding Lyle's mother from seeking medical care for him during the four-week ordeal leading up to Lyle's death. It was only after

defendant inflicted injuries rendering Lyle totally unresponsive that the victim's mother demanded medical care. While it is true that defendant did call 911 following a demand from Lyle's mother, he continued to conceal the cause of Lyle's injuries from emergency medical personnel.

For the foregoing reasons, we conclude that each case where the jury has found the "especially heinous, attrocious, or cruel" aggravating circumstance and this Court has found a sentence of death disproportionate is distinguishable from the case *sub judice*.

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although this Court reviews all of the cases in the pool when engaging in our duty of proportionality review, we have repeatedly stated that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* It suffices to say here that we conclude the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence of death disproportionate or to those in which juries have consistently returned recommendations of life imprisonment.

Of particular note is the similarity of this crime to the crime in *State v. Elliott*, 344 N.C. 242, 475 S.E.2d 202, resulting in the imposition of the death penalty. In *Elliott*, as in the case *sub judice*, an individual entrusted with providing care for a young child betrayed that trust and inflicted fatal injuries upon the child. While both cases involve "boyfriends" of the victim's mother, the instant case is even more heinous, as defendant was not only a "boyfriend," but also the victim's father. Both defendants engaged in violent assaults upon the helpless victims, and both defendants attempted to conceal the victims' injuries rather than seeking emergency medical care.

Finally, we noted in *State v. Daniels*, 337 N.C. 243, 446 S.E.2d 298, that similarity of cases is not the last word on the subject of proportionality. Similarity "merely serves as an initial point of inquiry." *Id.* at 287, 446 S.E.2d at 325; *see also State v. Green*, 336 N.C. at 198, 443 S.E.2d at 46-47. The issue of whether the death penalty is proportionate in a particular case ultimately rests "on the experienced judgment of the members of this Court, not simply on a mere numerical comparison of aggravators, mitigators, and other circumstances." *Daniels*, 337 N.C. at 287, 446 S.E.2d at 325.

Based on the nature of this crime, and particularly the distinguishing features noted above, we cannot conclude as a matter of law that the sentence of death was excessive or disproportionate. We hold that defendant received a fair capital sentencing proceeding, free of prejudicial error.

NO ERROR.

Justice WYNN did not participate in the consideration or decision of this case.