**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1

RANDY LYNN ATKINS,

                    Petitioner – Appellant,

          v.

KENNETH E. LASSITER, Warden, Central Prison, Raleigh, North
Carolina,

                    Respondent – Appellee.

Appeal from the United States District Court for the Western
District of North Carolina, at Asheville.  Martin K. Reidinger,
District Judge.  (1:06-cv-00372-MR)

Argued:  September 19, 2012          Decided:  November 7, 2012

Before KEENAN and FLOYD, Circuit Judges, and Timothy M. CAIN,
United States District Judge for the District of South Carolina,
sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Jonathan Lee Megerian, Asheboro, North Carolina, for
Appellant.  Sandra Wallace-Smith, NORTH CAROLINA DEPARTMENT OF
JUSTICE, Raleigh, North Carolina, for Appellee.  **ON BRIEF**: Paul
M. Green, OFFICE OF THE APPELLATE DEFENDER OF NORTH CAROLINA,
Durham, North Carolina, for Appellant.  Roy Cooper, Attorney
General of North Carolina, Raleigh, North Carolina, for
Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

On November 18, 1993, in the Superior Court of Buncombe County, North Carolina, Randy Lynn Atkins pled guilty to first-degree murder in the death of his eight-month-old son, Lyle James Atkins. On December 8, 1993, following a capital sentencing hearing, a jury unanimously recommended that Atkins be sentenced to death. The presiding judge imposed the recommended sentence.

On direct appeal, the North Carolina Supreme Court upheld Atkins's sentence, and the United States Supreme Court denied Atkins's petition for a writ of certiorari. Thereafter, he unsuccessfully sought state post-conviction relief. He then filed a petition for habeas corpus relief, pursuant to 28 U.S.C. § 2254, in the Western District of North Carolina. On August 16, 2011, the district court denied Atkins's petition, and we subsequently granted a certificate of appealability. We now address Atkins's claims that he received ineffective assistance of counsel and that the State failed to disclose materially favorable evidence.

I.

A.

The facts underlying Atkins's conviction are as follows:

The State presented evidence at the sentencing proceeding tending to show that, on 16 March 1993,

3

defendant inflicted fatal injuries to his son, Lyle. Defendant, Lyle, and Lyle's mother were living together at the time at the Lazywood Mobile Home Park in Buncombe County.

Lyle's mother, Ms. Colleen Shank, testified that on the morning of 16 March 1993, she asked defendant to watch Lyle while she washed some clothes. Ms. Shank stated that she heard a "bang." Following the "bang," Ms. Shank heard Lyle begin to cry, and she rushed to the living room. Ms. Shank testified that she then observed defendant hitting Lyle's head against the trailer wall a "few times." She testified further that she saw defendant "swing him [Lyle] very strong" and that "Lyle hit the wall very hard." Ms. Shank tried to comfort Lyle and attempted to lay the child down to rest. However, Lyle soon began to cry, and Ms. Shank noted that he was turning blue. The mother administered CPR and requested that defendant go to a neighbor's home to call 911 for emergency assistance.

Defendant then went to the home of a neighbor and called 911. The 911 operator testified that defendant responded to her questions concerning medical history related to Lyle's emergency by replying[,] "it . . . may have been sick two or three days, but no other." Lyle's mother testified that while waiting for emergency personnel to arrive, defendant told her, "Don't say anything, because I will hurt you too."

Following the arrival of emergency medical personnel, Lyle was transported by helicopter to Mission Memorial Hospital in Asheville. Upon admission to the hospital, Lyle was noted to be limp, not moving, and exhibiting a slow heart rate. The admitting physician noted numerous injuries to the small child, including bruising on both sides of his head, an older bruise on his left elbow, bruising on his right wrist and right hand, a deformation of his pelvis, and an improperly healed fracture of his right lower leg.

A detective from the Woodfin Police Department questioned defendant and Ms. Shank in the waiting room of the hospital. Defendant initially told the officer that Lyle had stopped breathing "because of the Ker-O-Sun heater." Defendant responded to the officer's further inquiry by adding that "a couple of days ago I was holding him, and he slipped and fell, and he hurt his arm." The officer subsequently arrested both

4

defendant and Ms. Shank and transported them to the Buncombe County jail. Later that day, while in police custody, defendant issued a written statement in which he admitted the following:

> Today Lyle was crying as I was holding him, and my temper and patience snapped again, as he was crying and crying no matter how soothing and gentle I was. He just kept crying, and I couldn't handle him any more, and I started hitting him on the side of his head and trying to get him to stop crying, and he wouldn't. I kept telling him to stop it, and he wouldn't, and I kept on hitting him with my hand on his head.

> Despite aggressive medical efforts to save Lyle's life, he died at Asheville's Mission Memorial Hospital on 18 March 1993.

State v. Atkins, 505 S.E.2d 97, 105 (N.C. 1998).


B.

The State indicted Atkins for first-degree murder and for first-degree sexual assault. As a condition of his guilty plea for murder, the State dismissed the sexual assault charge and agreed not to reference that charge or other alleged sexual assaults during the sentencing hearing.

At the sentencing hearing, the State presented evidence supporting one statutory aggravating circumstance—namely, that the murder was "especially heinous, atrocious, or cruel." N.C. Gen. Stat. § 15A-2000(e)(9). An experienced pediatric radiologist testified that

5

the eight-month-old infant exhibited the following injuries upon admission to Mission Memorial Hospital on 16 March 1993: healing fracture of the right clavicle, healing bone along the midshaft of the right upper arm, extensive injury of the left upper arm, dislocation of the left elbow, healing bone indicative of a fracture of the right hip, skull fractures and bruising on both the left and right sides, and a compression fracture of the spine. Further testimony indicated that the injuries occurred in at least two episodes of injury to Lyle. The pediatric radiologist estimated that the time of the origin of injuries ranged from four weeks prior to the hospital admission up to within a day of the admission. Several treating physicians also testified at the sentencing proceeding that Lyle exhibited symptoms of "battered child syndrome." . . . Dr. Cynthia Brown, a pediatrician, . . . defined a "battered child" as a "child that presents with multiple purposely inflicted injuries that are of varying ages."

Atkins, 505 S.E.2d at 106.

Atkins responded with twenty-five potential mitigating circumstances and a statutory "catchall" mitigating circumstance, see N.C. Gen. Stat. § 15A-2000(f)(9). He presented mitigating evidence via testimony from psychologist Dr. Joseph Horacek, social worker Audrey Bryant, former employer Jesse Carr, and an investigator from the public defender's office, David Waites.

After weighing the mitigation against the aggravation, the jury found as aggravation that the murder was "especially heinous, atrocious or cruel," see N.C. Gen. Stat. § 15A-2000(e)(9), and as mitigation that (1) Atkins "qualifie[d] as having a learning disability due to his IQ variations," and (2)

6

Atkins "was diagnosed . . . in April of 1993 as having a personality disorder and adjustment disorder with a mixed disturbance of emotions and conduct." Ultimately, the jury unanimously recommended a death sentence, and the court followed the jury's recommendation.

## II.

### A.

On direct appeal, the North Carolina Supreme Court upheld Atkins's capital sentence, Atkins, 505 S.E.2d at 131, and the United States Supreme Court denied Atkins's petition for a writ of certiorari, Atkins v. North Carolina, 526 U.S. 1147 (1999).

### B.

Atkins next filed several motions for appropriate relief (MAR) in the Superior Court of Buncombe County. After summary denial of many of Atkins's claims, Judge Winner of the Superior Court granted an evidentiary hearing on two issues: (1) whether Atkins was "denied his right to the effective assistance of counsel by counsel's failure to adequately investigate or to present sentencing phase [mitigating] testimony regarding [his] childhood history of neglect, abuse[,] and trauma," and (2) whether the prosecution withheld materially favorable evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963).

7

On January 12, 2001, the State moved for summary denial of Atkins's ineffectiveness claim. On April 2, 2001, Judge Guice of the Superior Court conducted a motions hearing, ultimately denying Atkins an evidentiary hearing on his ineffectiveness claim and granting the State's motion for summary denial. In denying an evidentiary hearing on the ineffectiveness claim, Judge Guice noted that, at the time Judge Winner initially granted such a hearing, the State had not yet filed a response to the claim.

On December 1, 2005, Judge Winner conducted an evidentiary hearing on Atkins's Brady claim and denied relief. The North Carolina Supreme Court then denied Atkins's petition for a writ of certiorari to appeal the denial of his MAR claims. State v. Atkins, 636 S.E.2d 811 (N.C. 2006).

C.

Atkins next filed a petition for a writ of habeas corpus pursuant to § 2254(d) in the United States District Court for the Western District of North Carolina. Atkins sought relief on the following grounds:

> (1) that he received ineffective assistance of counsel in the capital sentencing proceeding (Claim I); (2) that the [S]tate failed to disclose evidence materially favorable to him with respect to capital sentencing (Claim II); (3) that he was denied a full and fair opportunity to impeach his co-defendant's testimony by the [S]tate's failure to disclose its

8

deal with her and by the trial court's limitation of counsel's cross-examination of her (Claim III); (4) that he was shackled without cause during the capital sentencing hearing (Claim IV); and (5) that he was tried at the capital sentencing hearing without adequate measures to compensate for his hearing impairment (Claim V).

Atkins v. Polk, No. 1:06cv372, 2011 WL 3608234, at *6 (W.D.N.C. Aug. 16, 2011). On August 16, 2011, the district court denied Atkins's request for an evidentiary hearing, granted the State's motion for summary judgment, and declined to issue a certificate of appealability. Id. at *38. Atkins then filed a motion to alter or amend the judgment purusant to Federal Rule of Criminal Procedure 59(c). On January 17, 2012, the district court denied Atkins's motion to alter or amend the judgment. Atkins filed a notice of appeal on February 12, 2012, and on May 31, 2012, we granted a certificate of appealability.

### III.

Atkins raises two issues on appeal: (1) whether he received ineffective assistance of counsel in his capital sentencing hearing and (2) whether the State failed to disclose materially favorable evidence with respect to his capital sentencing. We review de novo a district court's denial of habeas corpus relief. Deyton v. Keller, 682 F.3d 340, 343 (4th Cir. 2012).

9

A.

We analyze Atkins's ineffectiveness claim under the framework outlined in Strickland v. Washington, 466 U.S. 668 (1984).[1] To succeed under Strickland, Atkins must demonstrate (1) that his counsel rendered deficient performance and (2) that such deficiency was prejudicial. Id. at 687.

We adopt a deferential posture in our examination of defense counsel's performance. Harrington v. Richter, 131 S. Ct. 770, 788 (2011) ("An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest 'intrusive

---

[1] We acknowledge that the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (codified at 28 U.S.C. § 2254(d)), limits the federal review of habeas claims adjudicated on the merits in state court, Richardson v. Branker, 668 F.3d 128, 138 (4th Cir. 2012). Moreover, we are aware of this Court's recent discussion of whether a state court proceeding constituted a merits adjudication. See Winston v. Pearson (Winston II), 683 F.3d 489, 496–97 (4th Cir. 2012); Winston v. Kelly (Winston I), 592 F.3d 535, 555–56 (4th Cir. 2010).

Here, the parties offer conflicting views regarding whether the state court conducted a merits adjudication of Atkins's ineffectiveness claim. If it did, then we would give AEDPA deference to the state court's application of Strickland. See 28 U.S.C. § 2254(d). But, if not, then we are to conduct a de novo review of the claim under Strickland. See Cone v. Bell, 556 U.S. 449, 472 (2009). We need not make a determination on this point, however. As discussed below, even under a de novo review, which here is more advantageous to Atkins, Strickland does not accord Atkins relief.

post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." (quoting Strickland, 466 U.S. at 689-90)). Indeed, we consider representation effective unless it "fall[s] below an objective standard of reasonableness," id. at 787 (quoting Strickland, 466 U.S. at 688) (internal quotation marks omitted), asking simply "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom," id. at 788 (quoting Strickland, 466 U.S. at 690). In sum, we are concerned primarily with whether "counsel made errors so serious that [it] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 787 (quoting Strickland, 466 U.S. at 687) (internal quotation marks omitted).

A defendant is prejudiced by ineffective representation when "a reasonable probability [exists] that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 787 (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted). Thus, merely identifying "some conceivable effect on the outcome of the proceeding" is insufficient. Id. (quoting Strickland, 466 U.S. at 693)

11

(internal quotation marks omitted).  Simply put, a defendant must show that "[t]he likelihood of a different result [is] substantial, not just conceivable."  Id. at 792.

Notably, when applying Strickland, we "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  Strickland, 466 U.S. at 697.  Rather, because "[t]he object of an ineffectiveness claim is not to grade counsel's performance[,] [i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," we should do so.  Id.

1.

Here, Atkins alleges that his defense counsel failed to adequately investigate and present mitigating evidence regarding his background and that such failure resulted in his counsel's reliance on an alternate, futile defense.  Before examining the evidence Atkins maintains his counsel should have investigated and presented, we chronicle the mitigating evidence that his counsel did present.

a.

Dr. David Horacek

Psychologist Dr. David Horacek testified that he evaluated Atkins for approximately twenty-two hours between July 1993 and November 1993 and that he gave Atkins a primary diagnosis of disassociative identity disorder, also known as multiple personality disorder. Horacek indicated that Atkins may also suffer from Attention Deficit Hyperactivity Disorder.

Horacek explained that the main feature of multiple personality disorder is "an impairment in the normal ability to integrate memory, identity and perceptions into one personality." Individuals suffering from this disorder have several personalities that "endure over time, and at various points of time the alter[nate] personality will assume control of the [individual's] consciousness and behavior." Horacek avowed that during his evaluation of Atkins, two alternate personalities were evident.

Horacek further stated that development of a multiple personality disorder can arise from severe physical or sexual abuse that occurs for a length of time or from painful trauma that occurs when an individual is a child. An individual develops alternate personalities as a means of coping and creating distance from the experiences. Horacek attested that, while evaluating Atkins, he learned that Atkins was sexually abused at least three times as a child by his older half-brother

13

Butch and other boys in the neighborhood.  He briefly testified that victims of child abuse often become abusers themselves.

Horacek also averred that he believed Atkins had killed his son while one of Atkins's alternate personalities was in control and that Atkins was mentally or emotionally disturbed during the crime's commission.  Such disturbance, Horacek opined, impaired both Atkins's ability to conform his conduct to the law's requirements and his ability to appreciate the criminal nature of his conduct.


## Audrey Bryant

Social worker Audrey Bryant interviewed Atkins in jail and affirmed that (1) Atkins admitted he had inflicted the bruises his son received, (2) Atkins had his head in his hands during most of the interview, and (3) Atkins wished he could tell the mother of the child that he was sorry.


## Jesse Carr

Atkins worked full-time for Jesse Carr at Minico Cleaners and Laundry for approximately a year and worked intermittently on a part-time basis for an additional six months.  Carr indicated that Atkins was a good worker and that he left the cleaners to find employment with higher pay.

<u>David Waites</u>

David Waites, an investigator for the public defender's office, testified regarding Atkins's childhood, parents, and Air Force service. He stated that, although Atkins's parents were in fragile heath and unable to attend the sentencing hearing, they had provided two letters for presentation at the hearing. The letters indicated that Atkins suffered from childhood illnesses that caused a loss of hearing in his right ear. The letters also indicated that Atkins joined the Air Force at seventeen.

Additionally, Waites presented several photographs and newspaper clippings: (1) a high school graduation photograph of Atkins, (2) a newspaper clipping indicating that Atkins had received an Air Force recruiting award, (3) a photograph of Atkins in his Air Force uniform, (4) three newspaper clippings noting that Atkins provided music for a veterans' party, (5) a newspaper clipping signifying that Atkins was a Military Security Specialist in an Air Force squadron serving in England, and (6) a newspaper clipping showing that Atkins was the winner of a Cub Scout Pack derby.

Finally, Waites averred that Atkins was involved in three alcohol-related incidents during his time in the Air Force, that he received an honorable discharge from the Air Force due to his "apparent inability to comprehend his misconduct," and that

twelve days prior to Lyle's admission to the hospital due to Atkins's abuse, Atkins had been the victim of an armed robbery.

As noted above, the jury ultimately credited only two mitigating circumstances to Atkins: (1) that he suffered from a learning disability and (2) that he suffered from "a personality and adjustment disorder with a mixed disturbance of emotions and conduct."

b.

Atkins contends that he received ineffective representation because his counsel focused on Dr. Horacek's testimony and belief that Atkins committed the murder while under the control of another personality. Atkins argues that the "'multiple personality' sentencing defense was a disaster [because] [i]t was based on inaccurate, unreliable statements made by Atkins while he was under the influence of sodium amytal, and was not backed up with any independent documentary or testimonial evidence."

Further, Atkins maintains that by focusing on Dr. Horacek's opinions regarding the reasons he murdered his son, his counsel failed to adequately investigate his childhood. He argues that an adequate investigation would have revealed the "abject circumstances of [his] childhood" and would have resulted in a decision to present "credible expert mental health testimony

16

explaining the relationship between such a personal history and [Atkins's] capital offense."

Specifically, Atkins asserts in his opening brief to this Court that his counsel could have investigated and possibly presented the following evidence:

- Testimony from Atkins's half-brother Butch, corroborating and elaborating on details from an affidavit that indicated severe abuse by Atkins's parents. The affidavit notes that, when the defendant was born, he became the favored child and his parents began to physically and mentally abuse Butch and another brother, Ronald. Such abuse included beatings and the requirement that they live in an outhouse and eat outside. Butch and Ronald also suffered sexual abuse at the hands of another half-brother, Floyd. The abuse eventually led to the removal of Butch and Ronald from the Atkins' home.

- Testimony from Atkins's school guidance counselor Deane Passmore that the physical circumstances he observed when he visited Atkins's home in 1968 were "among the very worst that [he] ha[d] seen in [his] 35 years as [g]uidance [c]ounselor" and that such circumstances "must have [had] a severe impact on [Atkins]."

17

- Pennsylvania family court records documenting the severe abuse occurring in the home of the Atkins family and the permanent removal of Ronald and Butch from the home due to such abuse.

- Pennsylvania criminal court records showing that Atkins's mother was arrested for forging prescriptions for a type of methamphetamine.

- Proffered witness statements showing that Atkins's mother was addicted to prescription medication.

- Testimony from Atkins's schoolmates that he was a social outcast and was subjected to regular emotional and physical abuse.

- Testimony from Atkins's shop teacher Bob Carlson that Atkins suffered "extraordinary cruelty and humiliation" at school.

- Testimony from Ann Blair, former director of the Senior Center in Sheffield, Pennsylvania, that she witnessed Atkins's father "using [Atkins] 'as bait' to elicit sympathy and handouts from the elderly residents at the Senior Center" and that she believed Atkins's father used him "to help con other vulnerable people and shoplift from stores."

18

- Testimony from social worker Joan Podkul, who "could have conducted an adequate sentencing investigation, provided its results to trial counsel, and testified to Atkins'[s] social history, drawing together all of the available information for a coherent presentation to the jury."

- Testimony from forensic psychiatrist Dr. Seymour Halleck that a "significant relationship [existed] between Atkins'[s] dismal social history and his mental state and behavior at the time of the offense," that Atkins's mental state was not attributable to multiple personality disorder, and that multiple personality disorder is viewed with skepticism and not supported by the evidence in this case.

2.

Nevertheless, regardless of whether Atkins's counsel rendered deficient performance, we are unconvinced that his counsel's failure to uncover or present the evidence outlined above prejudiced him. "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence," Wiggins v. Smith, 539 U.S. 510, 534 (2003), asking whether "there is a reasonable probability that,

19

but for counsel's unprofessional errors," the jury would have recommended a different sentence, Strickland, 466 U.S. at 694.

a.

First, we are unconvinced that the evidence Atkins offers would have provided further mitigation. Testimony from Atkins's half-brother Butch and from his guidance counselor would have detailed the horrific physical conditions of the home of the Atkins family. Nevertheless, contrary to the implications that Atkins makes in his brief, these sources focus on the conditions and abuse that Butch and Ronald suffered, not on damaging treatment that Atkins received. Indeed, Butch's affidavit indicates that Atkins did not suffer the abuse that he and Ronald did because his parents favored Atkins over him and Ronald. Further, although the additional testimony indicates that Atkins was sexually abused, the jury was already aware, via Dr. Horacek's testimony, that Atkins had been sexually abused by his half-brother and neighborhood boys.

Atkins's contention that the investigation and presentation of details of his childhood would have allowed for "credible expert mental health testimony explaining the relationship between such a personal history and [Atkins's] capital offense" also lacks merit. We have reviewed Halleck's actual testimony and affidavits, noting that he testified that Atkins was

severely neglected and abused as a child and that children who have experienced such treatment often suffer from depression and personality disorders. Moreover, he diagnosed Atkins with intermittent explosive disorder; personality disorder not otherwise specified; antisocial, borderline, and narcissistic traits; and a substance abuse disorder. He declared that a "significant relationship [existed] between Atkins'[s] dismal social history and his mental state and behavior at the time of the offense" but that his mental state was not attributable to multiple personality disorder.

Most notably, however, Halleck did not explain how Atkins's childhood circumstances would have caused him to abuse his own son. Consequently, although his testimony might have enlightened the jury regarding Atkins's background and tendencies, we are unconvinced that it would have proved mitigating. Indeed, as the district court recognized, Halleck's lack of explanation regarding the connection between Atkins's exposure to abuse and the murder of his son may have actually proved detrimental--

> At best, [Dr. Halleck] would have left the impression that [Atkins's] mental state was impaired because he was abused as a child, which would have invited obvious, but not necessarily beneficial, comparisons to the level of abuse that Butch had suffered and to the relatively positive course that Butch's life ultimately had taken.

Atkins, 2011 WL 3608234, at *17.

b.

Second, there is no reasonable probability that any additional mitigation provided by the evidence Atkins cites would have overcome the aggravating circumstances of the murder and altered the jury's recommended sentence. The jury found that the murder was "especially heinous, atrocious, or cruel." Indeed, evidence adduced at the sentencing hearing revealed that Atkins hit Lyle's head against the wall of his mobile home multiple times. Medical exams revealed that Atkins physically abused Lyle so severely that nearly every extremity of his body evidenced either a fracture or other notable injury. Lyle exhibited

> [a] healing fracture [on] the right clavicle, [a] healing bone along the midshaft of the right upper arm, extensive injury of the left upper arm, dislocation of the left elbow, [a] healing bone indicative of a fracture of the right hip, skull fractures and bruising on both the left and right sides [of the skull], and a compression fracture of the spine.

The pediatric radiologist that examined Lyle testified that "[i]n the twenty-two years that [he] ha[d] been doing pediatric radiology and in the nine years that [he] practiced pediatrics before becoming a pediatric radiologist, [he] ha[d] never seen as extensive bone injuries as [Lyle] had." Furthermore, testimony from several witnesses indicated that Lyle did not

22

immediately lose consciousness and that he would have felt and suffered from the pain associated with his injuries.

Given these atrocities, we cannot conclude that there is any reasonable probability a jury would have recommended a different sentence if presented with the additional mitigating evidence Atkins offers. Accordingly, we hold that his counsel's failure to investigate and present such evidence did not prejudice him, and thus, we affirm the district court's award of summary judgment on this claim.

B.

Atkins also alleges that the State violated <u>Brady</u> by withholding a statement that his former sister-in-law made to law enforcement regarding the physical conditions of his childhood home and the abuse his mother inflicted on his brothers. Because the state court adjudicated Atkins's <u>Brady</u> claim on the merits, we review his allegations "through the dual lens of the AEDPA standard and the standard set forth by the Supreme Court in <u>Brady</u>." <u>Richardson v. Branker</u>, 668 F.3d 128, 144 (4th Cir. 2012). Per AEDPA, once a state court has adjudicated the merits of a claim, a federal court may not grant a writ of habeas corpus on that claim unless the state court's adjudication:

23

>     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>     (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding.

28 U.S.C. § 2254(d).

Under Brady, the prosecution deprives a criminal defendant of due process when it suppresses evidence that is both favorable to the defendant and "material either to guilt or to punishment, irrespective of" whether it suppressed the evidence in good faith. 373 U.S. at 87. Evidence qualifies as material "if there is a reasonable probability that the proceeding would have resulted in a different outcome had the evidence been disclosed to the defense." Richardson, 668 F.3d at 145; see also Strickler v. Greene, 527 U.S. 263, 280 (1999). Thus, the key question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995).

1.

Here, Atkins contends that the State violated Brady by failing to disclose the following statement that his former sister-in-law, Katherine Whipple, made to law enforcement:

24

> She stated that [Atkins] appeared to be a nice kid but had a lot of family problems. Two other brothers[,] Butch and another brother[,] ran away from home when they were teenagers. She believes that this was due to Floyd's mother having Floyd beat them and then making them sleep in the outside to[ilet]. To her knowledge the [Atkins] still don't have a[n] indoor to[ilet].

Atkins avers that, had Whipple's statement been disclosed, "it would have alerted defense counsel to the critical importance of thoroughly investigating Atkins'[s] childhood family circumstances and provided contact information for two witnesses with useful information and further investigative leads."

2.

Employing AEDPA, we consider whether the state court "unreasonabl[y]" applied clearly established federal law when it concluded that Atkins failed to prove that "any of the evidence [he] might have developed if [he] had known of [Katherine Whipple's statement]" would have with any reasonable probability resulted in a different sentence. We conclude that the state court's determination was both reasonable and correct.

Simply put, Atkins has failed to show that Whipple's statement is material. Even if its disclosure would have induced defense counsel to further investigate Atkins's childhood, such investigation would have disclosed only the additional mitigating evidence that we have already examined

25

under Atkins's ineffectiveness claim.  As we concluded above, no reasonable probability exists that the presentation of such evidence would have altered the jury's recommended sentence. Accordingly, we affirm the district court's grant of summary judgment to the State on this claim.

IV.

We have reviewed the district court proceedings on the ineffective assistance of counsel claim de novo and concluded that Atkins has failed to prove that he suffered prejudice from that alleged ineffective assistance.  Upon our review of Atkins's <u>Brady</u> claim under the standard imposed by AEDPA, we conclude that Atkins's claim is meritless.  Accordingly, we affirm the district court's denial of his § 2254 petition.

<u>AFFIRMED</u>